(No. 19777

BERTHA EICHHORST, Defendant in Error, *vs.* EDWARD EICHHORST *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1930.*

FREDERICK C. HARBOUR, for plaintiffs in error.

RICHARD R. KLEIN, (ALVIN E. STEIN, of counsel,) for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause comes on writ of *certiorari* to the Appellate Court for the Second District to review the judgment of that court reversing a decree entered in the cause by the circuit court of DuPage county and remanding the cause to that court with directions to grant the relief prayed in the bill.

Defendant in error, Bertha Eichhorst, who is the widow of Emil Eichhorst, deceased, who died testate September 27, 1925, filed a bill to set aside a certain trust agreement executed by her and plaintiffs in error, children of Emil Eichhorst, on the ground of fraud, undue influence and want of consideration. She also filed a renunciation of the will and an election to take under the statute. Plaintiffs in error answered the bill denying her right to the relief sought, and filed a cross-bill seeking to set aside and cancel defendant in error's renunciation and election. The cause was heard before a jury and certain interrogatories were there submitted. The jury returned a verdict answering the interrogatories in favor of plaintiffs in error, and the chancellor entered a decree dismissing the original bill for want of equity and granting the prayer of the cross-bill.

The facts are, for most part, not in dispute. Defendant in error and Emil Eichhorst, deceased, were married during August, 1911. At that time Emil Eichhorst was a widower residing with his children, plaintiffs in error, on

his farm of 320 acres, near Downers Grove, Illinois. He continued to reside there with defendant in error and his family from that time until December 19, 1919, when they moved to Downers Grove. On November 22, 1919, he executed his last will and testament, in which he by the third clause gave to his widow all of the household goods, also the house and lot where they lived, situated in Downers Grove, which were to be taken by her in lieu of widow's award, dower and homestead, to be held for and during her natural life or so long as she remained his widow. The fourth paragraph of the will devised and bequeathed to his executors and trustees, in trust, all of the balance of his real estate, with power to manage it, pay out of the gross income the taxes and costs of the necessary maintenance, "then to pay to my said wife, Bertha Eichhorst, monthly, one-third of all the net income of my estate during her natural life." The balance of this income was to be divided among his children, share and share alike, with provisions for surviving children or grandchildren. Three of his sons were appointed executors and trustees without bond. In March, 1925, he and defendant in error entered into a contract to sell the farm to one Nelligan for $88,000, subject to a mortgage of $8000. A portion of the purchase price was paid down and the balance was to be paid in installments according to the contract, with a final payment of $58,000 on or before April 18, 1926. Emil Eichhorst died on September 27, 1925. His will was admitted to probate and letters testamentary were issued to the executors named in the will. The parties to this lawsuit are not in agreement as to the value of the estate, but defendant in error states that it is in the neighborhood of $100,000, while plaintiffs in error state that its net value is approximately $70,000. The estate, whatever its value, after the sale of the farm consisted of the contract of sale, with the cash paid thereon, and the homestead and five vacant lots in Downers Grove.

The trust agreement in question, executed by defendant in error and all of the children of Emil Eichhorst, deceased, bore date November 25, 1925. It was prepared by one Gustav H. Bunge, attorney for the executors, and in its preamble recites the making of the will of Emil Eichhorst, his death and the probate of the will. It is also in the preamble recited that the deceased by the third clause of his will had bequeathed to his widow all the household furniture, cooking utensils and other articles forming part of the household goods contained in the house, and gave and devised to her for her life or widowhood the house and lot in Downers Grove which he occupied as a homestead, all in lieu of her widow's award, dower and homestead rights, and further reciting: "It also appearing that by clause 4 of said will he gave, devised and bequeathed to his executors and trustees * * * all his other real estate of which he died seized and possessed, to manage said real estate in a husband-like manner for the best interest of all concerned, and to pay out of the gross income of the estate, first, all taxes and costs of the necessary maintenance, then to pay to his surviving widow, Bertha Eichhorst, monthly, one-third of the net income of said real estate." The preamble further recites that Emil Eichhorst, at the time he made his will, owned a farm of 320 acres, and that about a year before his death he sold it and a valid contract was entered into, and at the time of his death the only real estate owned by the decedent, in addition to the homestead occupied by Bertha Eichhorst, his widow, consisted of five vacant lots in the village of Downers Grove, from which there is no income whatsoever, and that therefore the widow of said decedent is deprived of the income which was contemplated by him in his last will and testament, and further setting out in the preamble that the widow was willing to abide the terms of the will, and that the heirs of the decedent were willing to make some provision for her that she may be given an income during her life. The

agreement then sets out that it is agreed by the heirs and executors to establish for Bertha Eichhorst a trust fund in the sum of $20,000, the income to be paid to her during her natural life and on her death the *corpus* of the trust fund to be distributed among the children of deceased.

In her bill defendant in error alleges that a fiduciary relation existed between her and the plaintiffs in error; that she had implicit trust and confidence in them and in the attorney who drew the contract and who was representing the estate; that in February, 1926, she learned, through others, that she was entitled to renounce the will and take one-third of the entire estate of the deceased; that at the time of entering into the contract she did not know the extent of her husband's estate and that her rights were not explained to her, and that in giving up her rights under the will and taking those provided for her in the trust agreement she was greatly damaged, and plaintiffs in error received by that contract substantially more than they would have received under the will or under the law of descent upon her renunciation of the will.

On the hearing defendant in error testified that between the 21st and 24th of November, 1925, Gustav H. Bunge, representing the executors and the estate, sent word to her by one of the sons that he wanted to see her; that she later went to see him; that a Mrs. Clara Kremske went with her, and that Bunge explained to her that the will was made six years previous and that the real estate was sold and there was nothing there for her. She testified that he did not tell her what she could get under the will or by renouncing the same, but told her that it would be better not to break the will and that the children wanted to put up $15,000 for her. She testified that she told him that was not sufficient; that she thought it ought to be $18,000; that two weeks later he called her and said the agreement was ready and asked her to come to his office; that this time she went alone and signed the contract, and that be-

fore signing it she said to him: "Mr. Bunge, are you doing the right thing for me? I cannot go out and work. I was too sick at that time and I can't go out and make my living. He said that was the best he could do for me." She stated that she did not have a copy of the agreement before she signed it. She also testified that after the funeral one of the boys took the key to the safety box and went to the bank and received the will and later brought her a copy; that at the time it was brought to her nothing was certain about what was going to be done; that they were all friendly; that she read the will once but did not understand it very well. She testified on cross-examination that Edward, one of plaintiffs in error, came to her house and told her that Bunge wanted to see her; that the real estate was sold and there was nothing for her to get, though he said nothing about making any arrangements for her; that before she signed the contract she asked Bunge if he could make it $20,000, and he went into another room and had the amount changed from $18,000 and she signed it. She also testified that she never attended an English school; that she attended a German school a little over three years; that she did not understand English very well; that after she had signed the agreement she saw an attorney about it and later filed her renunciation and the bill in this case.

Clara Kremske testified that she went with defendant in error to Bunge's office, where she collected some interest for her mother-in-law; that Bunge told Mrs. Eichhorst that since the real estate was sold there was nothing for her to get and the heirs were left to provide for her as best they could. He said they were willing to provide $15,000; that she asked him if he could make it $18,000; that they were there a little less than a half hour; that everything appeared friendly.

Bunge testified for plaintiffs in error that he did not call defendant in error to his office but that she came to see him and asked him about her husband's will; that she said she

understood that because the farm had been sold there was
no estate from which she could derive an income and that
the children should make some voluntary contribution for
her support. He testified that he told her there were two
things she could do, either renounce the will under the stat-
ute and take one-third of the estate, or, otherwise, if she
wanted to comply with the desires of her husband as ex-
pressed in the will, she should insist on some arrangement
by which the heirs would deposit securities with a trustee
from which she could derive sufficient income to keep her
during her life, and that she said she wanted to comply
with the desires of her deceased husband as nearly as she
could; that she would be satisfied with a deposit of such
mortgages or securities for $10,000, and that the witness
said he would take it up with the heirs. He testified that
about two days later she called at his office and stated
that $10,000 would not be sufficient—that it ought to be
$15,000—and that he told her he would suggest that to the
heirs and that he would draft an agreement and when it
was ready he would let her know. He testified she called
again in two or three days and wanted the amount to be
made $18,000 instead of $15,000, and that later the amount
was raised to $20,000. He testified that Mrs. Kremske was
not with Mrs. Eichhorst the first time she called regarding
the matter of her husband's estate; that he did not remem-
ber whether Mrs. Kremske was there at any time with de-
fendant in error, and that if she was, nothing was then said
about the trust agreement. He stated that when the trust
agreement had been drawn he gave her a copy and told her
to go to her lawyer, and if she did not have one, to get a
lawyer, and she told him she would, and that she later
returned the contract to him signed by her. On cross-
examination he testified that he told defendant in error
that under the will she would be entitled to one-third of
the net income of the real estate but there was no real es-
tate; that he interpreted the fourth clause of the will to

mean that she should have only the income from one-third of the real estate, and as the only real estate left was the homestead and five vacant lots, none of which were producing an income, there would be no income from the estate for her. Concerning what took place at the time of the conversation between defendant in error and the witness Bunge there appear in the record only the three witnesses, Bunge, defendant in error and Clara Kremske. Both of the latter directly contradict the witness Bunge as to the conversations.

It is not contended by counsel that either Bunge, who was attorney for the estate in which defendant in error was interested, or anyone else, told her more concerning her rights than that to which Bunge testified,—that is, that there was one of two things she could do, renounce the will and take one-third of the estate, or to insist on a trust agreement with the heirs for a certain trust fund. There is no evidence that anyone explained to her the extent of her interest in her husband's estate under the law or the will, what the estate amounted to, whether it would be to her advantage to enter into such a trust agreement, what it meant to renounce under the will or what amount she would receive if she renounced under the will. The contract is evidently quite advantageous to the heirs. They receive more than they would have received under her renunciation. In fact, under the trust agreement they received the entire estate, subject to her life interest in the homestead and a life interest in the $20,000. It is admitted that defendant in error was not versed in the English language. It is also admitted that a fiduciary relation existed between plaintiffs in error and defendant in error. None of the heirs testified that they ever explained to her what the meaning of the contract was or what her rights were under the will or under the law. There is no evidence that she had any advice whatever from any source except from Bunge, who was counsel for the estate and on whom she

naturally had a right to rely. It was the duty of plaintiffs in error, and good faith required them, either by themselves or through their attorney, to explain to the defendant in error fully the extent of her husband's estate, what a widow's award was, and the probable value of both her interest in the estate and the widow's award. (*Christensen* v. *Christensen,* 327 Ill. 448; *Lipscomb* v. *Allen,* 298 id. 537; *Beach* v. *Wilton,* 244 id. 413; *Mayrand* v. *Mayrand,* 194 id. 45.) The utter dependence of defendant in error upon the plaintiffs in error and counsel for the estate must have been apparent to them all, and it was their duty in good faith to explain to her fully what her rights were, so that she could determine what course she should pursue before executing a trust agreement whereby she released and surrendered her interest in her husband's estate. It was not disclosed to her, nor is it a fact, that the contract was advantageous to her. On the contrary, the contract is decidedly advantageous to the plaintiffs in error, as is evidenced by their activity in prosecuting this writ of error. Even with the figures of the estate given by plaintiffs in error, which place the net value at $68,192.29 after making all deductions, the defendant in error would have been entitled to a homestead of the value of $1000, a widow's award and one-third of the remainder of the estate, amounting to over $22,000, which under a renunciation of the will would become her absolute property. As against this the plaintiffs in error, without apprising her of the value of the estate or what she would receive if she renounced, secured from her a trust agreement which gave her the use of the homestead and the income from a trust fund of $20,000 during her life. The burden rested on plaintiffs in error to clearly show that in signing such a contract the defendant in error made an election with full knowledge of the facts. Granting to plaintiffs in error the benefit of the controverted testimony in the case, we are of the opinion that defendant in error signed the trust agreement in ignorance

of her rights, and this being so, the same was not binding on her and she had a right to revoke it. (*Carper* v. *Crowl,* 149 Ill. 465.) It is the settled rule in this State that transactions of parties between whom a fiduciary relation exists are *prima facie* voidable on grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contracts shows by clear and convincing proof that he has acted in perfect good faith and has not betrayed the confidence reposed in him. (*Thomas* v. *Whitney,* 186 Ill. 225; *Casey* v. *Casey,* 14 id. 112; *Beach* v. *Wilton, supra;* 1 Beach on Modern Law of Contracts, sec. 825.) It is the confidential fiduciary relation existing between the parties which gives rise to such suspicion. If a reasonable suspicion exists that the confidence has been abused the contract will be set aside. (*Dowie* v. *Driscoll,* 203 Ill. 480; *Beach* v. *Wilton, supra.*) And this though the contract is such that had no fiduciary relation existed the contract would not be disturbed.

Counsel argues that the Appellate Court was not justified in setting aside this decree on the facts; that the chancellor and the jury heard the witnesses and were in a better position than a court of review to know the truth of their testimony. It is true that courts of review will not, under such circumstances, set aside the finding of a chancellor unless it is manifestly against the weight of the evidence, but in this case the Appellate Court was justified in reversing this decree on the ground, if on no other, that plaintiffs in error did not show, as they were required to show, the utmost good faith in explaining to defendant in error her rights under the will and under the law.

We are of the opinion that under the record in this case the judgment of the Appellate Court is right, and it will be affirmed.                    *Judgment affirmed.*