In the Matter of the Estate of Esther A. Lightner, Deceased.

Elvis B. Adams, Individually and Executor of Estate of Esther A. Lightner, Deceased; Laura F. Adams, et al., Movants-Appellants, v. Joseph C. Lightner, Respondent-Appellee.

Gen. No. 66–91.

Fifth District.

March 31, 1967.

Lynndon M. Hancock, of Harrisburg, and Kern and Pearce, of Carmi, for appellants.

Charles H. Thompson and George B. Lee, of Harrisburg, for appellee.

EBERSPACHER, J.

Elvis B. Adams, executor of the Estate of Esther A. Lightner, deceased wife of Dr. Joseph C. Lightner, sought by sworn motion to strike the renunciation of the will, filed by Joseph C. Lightner the day following the entry of an order admitting the will to probate. The Executor was joined in the motion by each of the legatees and devisees, except Dr. Lightner; and it was therein contended that by reason of a written agreement, incorporated therein, between Dr. Lightner and the other devisees and legatees, previous to the probate of the will, his renunciation should be stricken. Dr. Lightner filed a sworn answer to the motion, alleging a fiduciary relationship between the nominated executor and Dr. Lightner, a lack of possession and apprisal of material facts and failure of Adams to make a full disclosure of the content of the will and the extent of the property involved; and that he was induced to enter into the agreement to his detriment, disadvantage and loss.

The evidence was heard, briefs submitted, and judgment entered, denying the motion to strike the renunciation and cancelling the contract, from which judgment this appeal has been perfected.

Lightner, an 80-year-old retired physician, and his wife were living in their winter home in Sarasota, Florida, when his wife became seriously ill and was hospital-

ized in Sarasota in January 1965. She remained in the hospital, in serious condition, until her death on March 17, 1965. Her brother, Elvis B. Adams, and his wife, Laura, arrived in Sarasota, from their Illinois residence, early in March, and stayed there approximately a week, in the Lightner home with Dr. Lightner, leaving Sarasota, after calling on Mrs. Lightner at the hospital on the morning of March 9. While there, each day Adams visited his sister in the hospital, and at her request itemized for her the property she advised him she owned for the purpose of making a will. The will was executed by Mrs. Lightner after Adams departed from the hospital on March 9, 1965, and was mailed by the attorney who prepared it to Adams at his home in Norris City, the will arriving on March 14. Until after his arrival at his Harrisburg, Illinois home, on Sunday, March 21, Dr. Lightner had no knowledge of his deceased wife having made a will. Mr. and Mrs. Adams had at his request opened up his Harrisburg home, where they remained with Dr. Lightner until some time after March 26. Funeral services for Mrs. Lightner were held at Harrisburg on Tuesday, March 23.

The Lightners had been married more than 30 years, and for a time after the marriage Dr. Lightner operated a hospital at Harrisburg, and Mrs. Lightner was manager, bookkeeper and laboratory technician therein. They retired in the late 1930's and thereafter they divided their time between Harrisburg and Sarasota.

Mrs. Lightner's will contained 10 provisions; these provisions with the property included, with its source are as follows: 1. Payment of debts, funeral expenses and costs of administration by executor. 2. Devise to Elvis B. Adams of all leases and interests in leases, specifically including oil, gas or mineral leases, and all real estate. This included testatrix' interest in 40 acres of land, held in tenancy-in-common with Dr. Lightner and ¼th mineral interest in 240 acres of land, on which

oil is being produced; the Doctor had given Mrs. Lightner the 1/4th mineral interest in this tract which he owned in fee, before any oil was produced therefrom. 3. Bequest to Elvis B. Adams of a 1959 Chrysler sedan which Dr. Lightner had purchased for Mrs. Lightner. 4. Bequest to sister, Nettie DeBoard, of $6,500 government bonds, which had been bought personally by Mrs. Lightner, a set of diamond ear screws and a mink coat, both of which were gifts from Dr. Lightner. 5. Bequest to Laura F. Adams of Platinum ring set with diamonds, which was an engagement ring given by Dr. Lightner, a ring set with 2 diamonds, which had been a gift from Dr. Lightner, a set of china which Mrs. Lightner had purchased, and an antique table which had been a gift of a neighbor, and clothing and personal effects. 6. Bequest to Betty Jean Black, daughter of Elvis B. Adams, of diamond set wristwatch, a gift of Dr. Lightner. 7. Request that wedding band be buried with decedent. 8. Bequest to Dr. Lightner of her interest in furniture except antique table; the record is uncontradicted that Dr. Lightner had acquired and owned all furniture except the antique table. 9. Bequest to Elvis B. Adams of residue and remainder of estate; this consists of 2 ceramic kilns, purchased by Mrs. Lightner. 10. Nomination of Elvis B. Adams as executor with power of public or private sale. All other property in which Mrs. Lightner had an interest at the date of her death was acquired by Dr. Lightner and held in joint tenancy with him, except a life insurance policy in which her brothers and sisters were beneficiaries.

According to Elvis Adams' testimony, on Monday morning, following Dr. Lightner's arrival in Harrisburg, Dr. Lightner told Adams that he guessed Mrs. Lightner's will was "in her lock box uptown," when Adams replied that he had received a will by mail from Sarasota, and that after breakfast they would go out where they could have quiet and peace without interruption and Dr.

Lightner could read the will. Adams further testified that following breakfast he and Dr. Lightner got into Adams' car and Adams drove out into the rural area, parked the car on a country road, handed Dr. Lightner the will; that Dr. Lightner read it, and stated there was certain property which he wanted, to which Adams replied he would arrange it provided Dr. Lightner paid the outstanding obligations and funeral expenses and accepted the will.[1] He further testified that Dr. Lightner handed the will back to him, they returned to Harrisburg, and Adams privately conferred with an attorney whom he advised of the terms agreed upon so that a contract could be made; that on the following morning Dr. Lightner pointed out that there would be funeral expenses in Harrisburg, and Adams agreed to divide them, and so advised the attorney.

Adams further testified that on March 26 he and Dr. Lightner went to the attorney's office where an agreement had been prepared; that a copy was given to each

---

[1] The pertinent testimony of Elvis Adams in answer to his counsel's question, "What happened then?" is contained in his answer, as follows:

"I produced the Will, handed it to the Doctor and he read it. And he got his information and he says, 'I think I should have the diamond engagement ring and the watch.' I says, 'Okay, I will stick my neck out inasmuch as the diamond ring goes to my wife and the watch goes to my daughter; I will grant you the ring and the watch providing you take care of all outstanding obligations including funeral expenses, transportation and so forth and agree to accept the Will.' He reached over and shook hands and he says, 'We'll do it.' We came back to town. I transmitted the agreement to Judge Hancock. The following morning I came downstairs and Doctor was sitting on the edge of the davenport. He said, 'Elvis, I forgot something.' He says, 'There's going to be a lot of funeral expenses here in Harrisburg.' I says, 'Well, Doctor, if that's all that's worrying you, I will agree to split those fifty-fifty with you.' He says, 'Fine.' I informed Judge Hancock of that agreement and he incorporated it in the agreement the Doctor signed."

of them, and it was read aloud to them, and Dr. Lightner read it for himself, it was then signed by each of them in quadruplicate, and the signed copies delivered to Adams who had his wife, daughter and sister affix their signatures, and returned them to the attorney.

Dr. Lightner testified that he first learned of a will about two hours after the funeral, March 23, when Adams in the presence of his wife Laura Adams, at his home in Harrisburg, said to him, "Esther has made a will" or "Esther made a will while we was down in Florida," at the same time pulling his coat open, so that Dr. Lightner could see a paper or envelope in his pocket, and that he was unable, due to an affliction of his vision, to tell which it was. He testified that there was no further discussion of the matter that evening except for Mrs. Adams saying, "Doctor, I hope to God you don't contest the will"; that he was stunned, tired and shocked, and the following morning Adams said, "Let's get in my car and go out and talk this will over—discuss it." He continued, that Adams drove by a circuitous route to a point in the country and pulled off to the side of the road between two cornfields, when Adams pulled a paper from his pocket, faced him and said, "Now I will read the will"; that "He said after the funeral expense, then started off by giving him the automobile, Nettie DeBoard the ear screws and his wife the diamond engagement ring and the double-set diamond ring and also the wedding ring and then his daughter was supposed to get the little wristwatch. He also mentioned the chinaware and her clothes and I believe that's all of any significance that he mentioned"; that he mentioned the mink coat, made no mention of real estate or oil wells, or anything other than the automobile that Adams was to get; and that Dr. Lightner never had the will in his hands.

According to Dr. Lightner, "I said, 'Elvis, I would like to have the engagement ring and the wristwatch,

especially for sentimental purposes.' He says, 'Doc, I can't do that. Esther willed the watch to my daughter and she willed the engagement ring to my wife, Laura.' I said, 'Elvis, I would like to have them.' He said, 'Well, Doc, I can't do that without putting it in writing or making some kind of a contract.' I said, 'That is not necessary. You've known me for thirty-six years and why couldn't we do that without having to do anything like that.' He said no we'd better have it in writing. There was nothing more said. I didn't hear anymore until a couple of days"; and that he told Adams that he had paid the funeral expenses in Florida, and agreed to pay them and half the funeral expenses in Harrisburg in exchange for the watch and ring. He testified that on the following morning Mr. and Mrs. Adams took him for a drive and that while in the car, he mentioned the jewelry and Mrs. Adams said, "Doctor, I hope you don't contest the will" and that he replied, "Laura, as far as I know now, the way Elvis read it to me, I don't have any idea of doing so." His further testimony was that after he had aroused from a nap on the afternoon of the 26th, Adams said, "Let's go up to Judge Hancock's office, he has some papers that he wants us to sign," that they were there and he "followed along" as the contract was read, that he could not see to read it and understood that it concerned only the watch and ring, which, for sentimental reasons, he wanted.

That Dr. Lightner was tired and under emotional strain and had taken a few "nembutals" during this period is undenied in the record, as is the fact that both his vision and hearing were impaired. The record substantiates the fact that at no time was he advised nor had knowledge of either his right to renounce the will or his right to a spouse's award under which he could have selected the items he wanted for sentimental reasons; the oil wells and real estate interests were

never discussed. He testified that he was of the impression that the will only disposed of the items he says were mentioned in the conversations with Adams. He was never given a copy of any will and the will was not presented to him in the attorney's office when he signed the agreement; he testified that he was then asked if he had read the will and answered that Adams had read it to him, but that he later determined that Adams had only read parts of it to him. It is to be noted that since he owned the furnishings and furniture, he would take nothing by the will, and that the will provided for debts and funeral expenses to be paid from the assets of the estate.

The agreement executed by Dr. Lightner, Elvis B. Adams, Laura F. Adams, Nettie A. DeBoard and Betty Jean Black, which was offered in support of the motion to strike the renunciation and claims filed by Dr. Lightner for funeral expenses, a hospital bill of Mrs. Lightner and for special nurses in amounts which had been paid by Dr. Lightner, provides that in addition to the property given Dr. Lightner under the will, the ring and watch bequeathed to Mrs. Adams and Betty Jean Black, respectively, were to be delivered to him, and he agreed to pay all debts, expenses in connection with the funeral up to the time the body arrived in Harrisburg, one-half the Harrisburg expenses, neither renounce nor contest the will, make no claim for spouse's award or any other claim against the estate; the other signatories agreed to the distribution of the ring and watch to Dr. Lightner and that they would not contest the will.

As a practical matter under the terms of the purported agreement, Dr. Lightner agreed to not only give up his spouse's award, in a minimum amount of $1,000 (the will not having any provision in lieu of the award),[2]

---

[2] Ch 3, §§ 178 and 182, Ill Rev Stats 1963.

but his right to renounce, the exercise of which could have resulted in his taking one-half the entire estate,[3] subject to the debts, funeral expenses and costs of administration, but also to voluntarily pay the debts and greater portion of the funeral expense from his personal funds, all in consideration of the ring and watch, and a promise to not contest the will by parties, who, if they had successfully contested the will would have received nothing.[4]

 At the hearing Dr. Lightner and Elvis B. Adams were the only witnesses who testified. Dr. Lightner testified that he was not aware at the time of these occurrences that he should consult an attorney; that the attorney selected by Adams was not one he used nor was it the one he contacted when he determined he should look into the matter. There is no denial in the record of the statements he ascribes to Mrs. Adams and the parties both testify that there was never any discussion of the possibility of a renunciation or claim for spouse's award; both testified they did not know of such legal proceedings, and that there was no discussion of the oil interests or any real estate during the negotiations. The weight to be given the testimony of the two witnesses was for the trial court.

Appellants' sworn motion, with the purported contract made a part thereof, attempts to estop Dr. Lightner from exercising his right to renounce, and his right of an election to take dower within 10 months of the probate of the will, as is provided by sections 17, 18 and 19 of The Probate Act (c 3, §§ 17, 18 and 19, Ill Rev Stats 1963). His sworn answer seeks to avoid the estoppel, by the allegations of a confidential relationship, absence of disclosure of material facts and a misplaced confi-

---

[3] Ch 3, § 16, Ill Rev Stats 1963. The record shows decedent's brothers and sisters to be heirs, and it is therefore concluded that she left no descendants.

[4] Ch 3, § 11, Par Third, Ill Rev Stats 1963.

dence resulting in action to his detriment, disadvantage and loss. Appellants here contend that this is not a case of equitable election or estoppel; that this is a case of enforcement of a contract for which good consideration has been delivered (the retention of the ring and watch by Dr. Lightner). This contention is based on their theory that Adams, at the time of the negotiations with his brother-in-law, was only the nominated executor, pointing out that Adams did not sign the agreement as executor, and thus no fiduciary relationship existed as established by the evidence, since Dr. Lightner's testimony, taken nine months after his wife's death, showed that he at that time knew the extent of her property and its source. They contend that he therefore was aware of it at the time of the execution of the agreement, and that, assuming he read neither the will nor agreement, at that time, he had the opportunity to do so, but made no specific request to do so. They urge that he should not be allowed to rely on misrepresentation or concealment to avoid the transaction when the means to learn the truth of the matter were readily available and could have been investigated by him—and that there was nothing to disclose to him as he had knowledge of her property, and the means to learn of its disposition by the will.

To us, these contentions fail to give the necessary consideration to the evidence of Dr. Lightner's physical condition, his deficiencies of hearing and sight, his emotional state, the circumstances of time and place surrounding the negotiations, as well as a long and pleasant acquaintanceship with Adams for more than 30 years which led him to repose in his brother-in-law a confidence which he would not have reposed in a stranger. Likewise these contentions ignore the fact that he believed the negotiations and a contract were unnecessary, and that he was not aware that valuable interests in real estate were the subject of the negotiations and

273

agreement. At that time, under the circumstances present, his concern was only with the sentimental value that he attached to particular property and his wanting it for its sentimental value; he was not then concerned with any other property values, or determining what his legal rights were or their preservation, and we do not consider that such concern or alertness is here required to preserve such legal rights.

■ ■ Appellants concede that as a matter of law, a qualified executor occupies a fiduciary relationship to the heirs and persons interested in the estate, and in dealing with them in reference to estate property must make a complete disclosure of all material facts, and that relief will be granted where confidence has been reposed and betrayed; but point out that such relationship extends only so far as the administration of the estate is concerned, and does not necessarily include all transactions between the parties and is limited to matters in the administration of the estate—pointing out that Adams did not sign as a representative of the estate—contending that Adams was only acting for the devisees and legatees.

■ ■ The estate was primarily liable for the debts and funeral expenses; the will directed them to be paid by the executor. The agreement purports to relieve the estate of that liability, as well as to relieve the estate property from the statutory spouse's award, in consideration of personal property which was property of the estate and sought to bar renunciation. Under such circumstances, and the state of this record, we conclude that the acts of Adams clearly arose out of the anticipated administration of the estate. Furthermore, even though letters had not been issued to the nominated executor, that a fiduciary relationship existed between Adams and Dr. Lightner as a matter of fact is conclusive from this record, and the same principles with reference to the necessity of full disclosure are here

274

applicable as in a case where letters have been issued. In Lipscomb v. Allen, 298 Ill 537, 132 NE 206, the court, in holding that Allen, a qualified coexecutor, occupied a position as a fiduciary as a matter of law, pointed out that the burden of showing that a transaction entered into with the surviving spouse, who was also a coexecutor, was entered into with full knowledge of its nature and effect and was the result of the spouse's deliberate, intelligent desire and for her benefit, was the burden of the coexecutor, Allen. There the court relied upon Mayrand v. Mayrand, 194 Ill 45, 61 NE 1040, a case in which the nominated executors procured a release of the spouse's award, before probate and letters, and in which both the Appellate Court [5] and the Supreme Court affirmed the overruling of the executor's objections to the spouse's award. Both the Mayrand and Lipscomb cases point out that the origin of the confidence and the source of the influence are immaterial and that an existing relation of trust and confidence raises a presumption against validity, and that the rule "embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another," and that this principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.

There is sufficient evidence in the record from which the trial court could find that a fiduciary relationship existed as a matter of fact, and we consider the sworn answer to appellants' motion sufficiently so pleads.

■ In Eichhorst v. Eichhorst, 338 Ill 185, 170 NE 269, the chancellor and jury heard and saw the witnesses, and a decree was entered denying a widow relief from a trust agreement she had entered into, and cancelling her renunciation and election. The Appellate

---

[5] 96 Ill App 481.

Court reversed, and the Supreme Court, taking the case on a writ of certiorari affirmed the Appellate Court, stating that the Appellate Court was justified in reversing on the ground that the plaintiffs in error did not show, as they were required to show, the utmost good faith in explaining to the widow her rights under the will and under the law, at the same time giving voice to the rule that courts of review will not under the circumstances present, set aside the finding of the trial judge, unless it is manifestly against the weight of the evidence. Citing Lipscomb v. Allen, supra, and Mayrand v. Mayrand, supra, the court there pointed out that there was a duty not only to point out the probable value of both her interest in the estate and the spouse's award, but what a spouse's award was. While it is apparent from the opinion that Mrs. Eichhorst was "not versed in the English language" and had little formal education, Dr. Lightner, according to uncontradicted testimony, had serious deficiencies of sight and hearing, and was physically tired, and testified that he did not realize that anything more than the personal property was involved. In Eichhorst v. Eichhorst, supra, at pages 193 and 194, the court said:

> "The burden rested on plaintiffs in error to clearly show that in signing such a contract the defendant in error made an election with full knowledge of the facts. Granting to plaintiffs in error the benefit of the controverted testimony in the case, we are of the opinion that defendant in error signed the trust agreement in ignorance of her rights, and this being so, the same was not binding on her and she had a right to revoke it. (Carper v. Crowl, 149 Ill 465.) It is the settled rule in this State that transactions of parties between whom a fiduciary relation exists are prima facie voidable on grounds of public policy. They will be closely scrutinized

by a court of equity, and relief will be granted unless the party claiming the benefit of the contracts shows by clear and convincing proof that he has acted in perfect good faith and has not betrayed the confidence reposed in him. (Citing authorities.) It is the confidential fiduciary relation existing between the parties which gives rise to such suspicion. If a reasonable suspicion exists that the confidence has been abused the contract will be set aside. (Citing authorities.) And this though the contract is such that had no fiduciary relation existed the contract would not be disturbed."

We conclude that those principles are applicable in this case.

We, therefore, affirm the judgment of the Circuit Court of Saline County.

Judgment affirmed.

MORAN and GOLDENHERSH, JJ., concur.