*In re* Estate of JUDSON B. NUYEN, Deceased.—(Elinor Nuyen, Petitioner-Appellant, *v.* Old Second National Bank of Aurora, Respondent-Appellee.)

Second District   No. 82—183

Opinion filed December 16, 1982.—Rehearing denied January 25, 1983.

John W. Long and A. Denison Weaver, Ltd., both of Chicago, for appellant.

Thomas K. Prindable, of Youssi, Prindable & Bina, of Batavia, and William C. Murphy and Patrick M. Kinnally, both of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellee.

JUSTICE HOPF delivered the opinion of the court:

Petitioner Elinor Nuyen appeals from the denial of her amended petition to remove the Old Second National Bank of Aurora (OSNB) from its position as executor of her deceased husband's estate, pursuant to section 23—2 of the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110/2, par. 23—2). The petition was brought in her capacity as representative of the beneficiaries of the estate and contended that OSNB had a conflict of interest, had wasted assets and had mismanaged the estate. After a hearing the circuit court of Kane County ruled in favor of OSNB.

Judson B. Nuyen died testate on April 30, 1973. His will, which was admitted to probate, nominated the appellee OSNB as executor. The will had been executed 10 years earlier in 1963 and left one-third of the estate to petitioner and two-thirds to decedent's father, Fred Nuyen. Charles Myler, who was retained as attorney for OSNB following decedent's death, had also been the family attorney for the Nuyens for many years. He advised petitioner to renounce the will and accept her statutory share. Myler assisted petitioner in seeking to have the will renounced, though the renunciation was filed late. He did not receive fees from petitioner for the advice that he gave her through the years. In March of 1981 petitioner did retain counsel and the renunciation was deemed effective by the court at that time. Upon renunciation the estate was divided so that the petitioner received one-third, each child received two-ninths and the remaining two-ninths was placed in trust for the benefit of the children. One of the children, Carey Nuyen, has reached the age of majority and has filed a supplemental brief. His brief urges that the previous orders of this court are not *res judicata* as to him, because he was a minor at the time those orders were entered.

Decedent's estate consisted mainly of an orthodontics practice and

two parcels of realty, Wellwood and Molitor Road. Despite this there was no cash in the estate, and the record indicates that the estate property did not produce sufficient income to meet the expenses that arose soon after decedent's death.

Petitioner contends that OSNB should be removed as executor for the following reasons: (1) It dealt with trust assets for its individual benefit; (2) it failed to prove that petitioner's consent to the various real estate transactions was validly obtained; (3) OSNB committed acts of waste and mismanagement in that it disposed of the dental practice without consideration, failed to secure an extension for payment of Federal estate tax, renegotiated a real estate contract improperly and mortgaged the assets of the estate for $320,000; and (4) petitioner also contends the court erred in denying her request for OSNB's counsel to produce all its records regarding the administration of this estate. Petitioner also contends that the doctrines of *res judicata*, collateral estoppel and *laches* do not operate to insulate the executor from accountability for its waste and mismanagement.

### THE ESTATE: A. ORTHODONTICS PRACTICE

The orthodontics practice earned gross income of $92,500 in the year preceding decedent's death. At trial Dr. George Osterberger testified, as an expert witness, that he had taught orthodontics at the University of Illinois for 10 years and one of his students had been the decedent. He indicated that petitioner had called him soon after Dr. Nuyen's death and she had asked him to help work with the patients that continued to come into decedent's office. Dr. Osterberger arranged for four local doctors to come in on various days and try to keep decedent's orthodontics practice going. He tried to find someone to take over decedent's practice and made an effort to evaluate what the practice was worth. He and the other doctors made this evaluation on the basis of the work that was left to do on the patients that were coming in and the amount of money remaining to be collected to do the work. They evaluated 90% of the patients. Dr. Osterberger worked with his accountant to evaluate the value of the practice. Dr. Osterberger testified that he was not working for OSNB but that he was helping the petitioner.

Dr. Osterberger's opinion was that quite a bit of the money had been prepaid and quite a bit of the work had yet to be done on decedent's patients. He indicated that one could get an orthodontist to come in and take over the practice by deceiving him—but that once he got into the practice and found out how much work there was to do, he would probably leave the practice. He foresaw a problem if pa-

tients who had already paid came in and were told they would have to pay additional money for further treatment. At a meeting with decedent's father, Fred Nuyen, and petitioner, Dr. Osterberger advised them he had found an orthodontist who had only been out of school for two years who would be willing to take over the practice. He suggested that the equipment and the office itself were furnished frugally and that the practice could not be sold but could be transferred to the new orthodontist in exchange for his assumption of decedent's obligation to perform the prepaid services. Although petitioner and Fred Nuyen objected to this, they consented to the transfer of the practice to Dr. Douglas Prince, the orthodontist recommended by Dr. Osterberger. They also consented to having the estate assume the $3,896.20 debt due on dental equipment.

Richard Kropp, trustee for OSNB, testified that Dr. Osterberger was a kingpin in keeping the office open. He testified that at a meeting he attended on May 23, 1973, Charles Myler was present. Myler, attorney for OSNB, indicated that if the parties did not act quickly some patients would sue the estate. Kropp testified that after the May 23 meeting it was basically understood that the only way to avoid the problem with the patients who had paid but had not been treated was to transfer the practice to the new doctor. Thus, Dr. Prince took over the practice almost immediately without payment.

### B. WELLWOOD

Wellwood was a 152-acre farm in Sugar Grove that decedent had purchased on contract. In 1971 decedent had obtained a mortgage for $147,370 and applied this to his contract to purchase Wellwood. Three months before his death he agreed to sell Wellwood on contract for $639,000. They put $190,000 down with the remainder due in three years. The purchaser of Wellwood borrowed $200,000 from Aurora National Bank for a down payment. However, decedent did not actually receive the $190,000 because he secured the purchasers' loan by taking $145,970 of the $190,000 down payment and investing it in 2,350 shares of AT&T stock and pledging the stock as collateral. The purchasers defaulted on the loan in 1974. This necessitated some action by the executor; OSNB petitioned the court for approval of a renegotiation of the contract. Under the terms of the new agreement Aurora National Bank would sell the security on the original note, $44,030, and a new note between purchasers and the estate would be executed. Purchasers thereby agreed to pay the full original purchase price less the amount that had been held as security. A guardian *ad litem* was appointed to represent the minor children, and all parties

agreed to the new contract. The court approved the petition on April 8, 1974. Until now no appeal was made.

One important event that occurred at the time of the renegotiation of the Wellwood contract occurred at a meeting between attorney Myler, petitioner and Fred Nuyen. At that time Fred Nuyen objected to personally signing the mortgage. Myler advised Fred Nuyen that he should get his own attorney if he and petitioner had any questions. Myler testified that he told Nuyen that he represented the executor—OSNB.

### C. THE FEDERAL ESTATE TAX

The original due date for payment of the Federal estate tax was January of 1974. OSNB filed a one-year extension, as permitted under the Code. The following year the estate still lacked sufficient cash to pay the taxes and OSNB again requested an extension. In reply to their request the Internal Revenue Service advised OSNB it would be required to fill out a number of forms and provide them with certain information. OSNB did not follow up on obtaining this extension. In lieu of obtaining an extension OSNB obtained court approval on October 23, 1975, to advance the estate $94,862.70. In December of 1975 it again petitioned the court, this time so that it could mortgage the estate's real estate in order to secure a loan to the estate of $320,000. The executor urges that this was used to repay the advances and was applied towards the existing mortgage on Wellwood and the contract on the Molitor Road property. It contends that neither the Federal Land Bank nor local lenders would make such a loan. The rate on the $320,000 was 9½% annual interest. Petitioner made no objection to the October or December petitions. After a hearing the court approved it. OSNB used $60,000 to pay off the tax obligation, $33,000 to pay off various claims and $220,000 to pay off the first mortgage and the balance on the Molitor Road property. OSNB received, *inter alia*, $8,000 in interest and paid itself a $3,200 commission for making the mortgage.

### ARGUMENTS ON APPEAL

The first issue addressed in this opinion was raised by the respondent OSNB. OSNB contends that the orders appealed from are *res judicata* and cannot be collaterally attacked in this subsequent proceeding. OSNB contends that the orders of October 23, 1975, and December 30, 1975, determined OSNB's right to advance and loan money secured by a first mortgage to the estate. The orders authorizing the loan were final and appealable orders that were not appealed

within 30 days. As such, OSNB contends to allow this appeal would be to ignore *res judicata*, and invite "never ending estate proceedings."

OSNB goes on to argue that the former adjudication bars this litigation because the same parties, subject matter and causes of action exist in both proceedings. In the recent case of *Varley v. Pickens* (1981), 98 Ill. App. 3d 884, 886, 424 N.E.2d 981, 983, the court discussed the application of estoppel by judgment, also known as *res judicata*, and specifically mentioned these three requirements for application of the doctrine. The related doctrine of estoppel by verdict, which would not require identity of cause of action (*Healea v. Verne* (1931), 343 Ill. 325, 175 N.E. 562), would only conclude matters in issue or points controverted upon the determination of which the finding or verdict was rendered. *People v. Bone* (1980), 82 Ill. 2d 282, 412 N.E.2d 444; *Cromwell v. County of Sac* (1877), 94 U.S. 351, 353, 24 L. Ed. 195, 197.

■ In applying the rules set out in *Varley v. Pickens* (1981), 98 Ill. App. 3d 884, 424 N.E.2d 981, it is clear that the previous orders and the current litigation both involve the same parties. They are identical. Similarly, both actions involve the same subject matter, *i.e.*, management of Dr. Nuyen's estate. The question that remains is whether or not the cause of action is the same. While the previous orders entered concern specific questions of how to manage decedent's estate, there was no allegation of mismanagement, waste or conflict of interest at that time. Petitioner urges that the allegation of a conflict of interest is new subject matter and a new cause of action. She urges that the testimony of Patrick Dixon, who had been appointed guardian *ad litem* for the minors and who testified in the hearing below, is supportive of her contention. Dixon testified that the question of the executor having a conflict of interest did not cross his mind. Petitioner urges that the conflict question was not raised, determined, nor considered and, therefore, it can be reviewed here.

Countering this, OSNB contends that the issues and the claims are the same, *i.e.*, the rectitude of the executor's actions is in issue in both cases. The order dated October 23, 1975, stated that the executor should be allowed to continue to make advances to the estate so as to preserve the estate assets. Interest for these advances was allowed at 8½%. The sum of $94,862.70 was approved as costs for estate administration. The executor's authority to make advances and use the estate assets as security was to run until December 15, 1975. As previously indicated, OSNB filed a subsequent petition requesting court approval for a $320,000 loan from the bank to the estate at

$9\frac{1}{2}\%$ interest for a term of five years. The loan was secured by a first mortgage on Wellwood and a first mortgage on an undivided three-quarter interest in 25 acres of Molitor Road property. Petitioner, Fred Nuyen and guardian *ad litem*, Patrick Dixon, attached their consents to the petition. On December 30, 1975, the court found that it would be in the best interests of the estate and all beneficiaries for the estate to obtain the loan and execute the mortgages.

Because the petitioner's contentions of a conflict of interest were not previously in issue, we believe the prior proceedings were not conclusive, and the doctrine of *res judicata* or estoppel by judgment does not bar review of this issue on appeal. In the case of *In re Estate of Garrett* (1969), 109 Ill. App. 2d 243, 247, 248 N.E.2d 539, 541, the court stated that when there is a different claim or demand from that raised in the prior proceedings, then *res judicata* is not applicable.

■ Because *res judicata* does not preclude review of the conflict of interest contention, that issue is now addressed. Petitioner contends that OSNB should be removed as executor because a conflict of interest is shown from the following facts. Charles Myler, one of the attorneys for the executor, OSNB, was a close personal friend of decedent and his family. He had represented the Nuyen family as their attorney on a real estate closing prior to decedent's death. During decedent's last illness Myler visited petitioner at the hospital and told her that he would help her. Subsequently petitioner consulted with Myler, and he advised her to renounce decedent's will. Myler prepared certain documents for her to renounce the will. Petitioner contends that she was not advised to seek independent counsel with regard to any transactions nor was she ever advised that a potential conflict existed.

After careful scrutiny we believe the record does not support petitioner's assertion in this regard. In fact, Myler testified that he advised petitioner and petitioner's father-in-law, Fred Nuyen, of a potential conflict of interest at the time when the executor bank was making the first mortgage loan. Fred Nuyen objected to the bank's requirement that he personally sign and become liable on the mortgage. Myler testified that Fred Nuyen said he did not want to sign because he was in his 70's and he requested that Myler intercede so that he would not have to sign the documents. At the hearing Myler testified that he told Fred Nuyen: "I said, 'Look, I represent the Executor. If you have any questions on this, you can get your own attorney.' I told him and Elinor." At another meeting Myler repeated this assertion and Fred Nuyen conceded to Myler that he had consulted an attorney but that it wouldn't do him any good. Petitioner was present

at the second meeting as well.

Thus, it is clear that attorney Myler advised petitioner and petitioner's father-in-law that he was representing OSNB as executor. The contention that an attorney-client relationship between petitioner and attorney Myler arose merely because the executor advised petitioner of her right to renounce the will is not convincing. It was the executor's fiduciary duty to advise petitioner of her rights as a beneficiary. (*Eichhorst v. Eichhorst* (1930), 338 Ill. 185, 192, 170 N.E. 269.) Further, petitioner never paid fees to Myler for his advice and, as OSNB points out, she received regular correspondence from Myler's office which clearly indicated Myler's law firm represented the executor rather than her as a beneficiary of the estate. Further, the fact that Myler may have failed to advise petitioner of the time limits within which to file a renunciation, as alleged in the affidavit prepared by Myler's office for petitioner, does not, as petitioner argues, show the existence of an attorney-client relationship, or, for that matter, a conflict of interest. *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764.

Petitioner argues that she consented to certain transactions presented to her by the executor without knowing that he was the attorney for OSNB. The argument, or at least the implication, is that petitioner thought Myler was her attorney and that Kropp, the trustee at the bank, was the attorney for the bank. Petitioner urges in her brief that she is a housewife and inexperienced in legal matters. However, the trial court which heard the petition for removal made a number of findings to which we must defer. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.) Here, the trial court found that the petitioner was an able, intelligent woman who had managed apartments, kept books, prepared income tax data and conducted real estate negotiations. The court found she was aware of the lack of cash in the estate, that she met frequently with the trust officer and attorney for the estate, that she appeared in court and acknowledged she was aware of the advances by OSNB to the estate. In sum, the court noted that the facts showed a knowing and active participation on the widow's part and that this was to her credit, but was also defeating in the sense that it belies the contention that she now makes.

In light of Myler's disclosure to petitioner and petitioner's father-in-law, as well as the trial court's findings that petitioner was an active participant in managing the estate, we do not believe the consents were invalid or that a conflict of interest tainted the manner in which the estate was managed.

■ The next contention addressed here is raised by Carey Nuyen,

the minor who reached majority and filed a separate brief in this appeal. Carey argues that *res judicata* and/or collateral estoppel does not apply to him because at the time the orders appealed from were entered he was represented by a guardian *ad litem*. He contends that minors cannot agree in court or be bound by any agreement made on their behalf by a guardian *ad litem*. (*Leonard v. Chicago Title & Trust Co.* (1936), 287 Ill. App. 397, 5 N.E.2d 282, 283.) *Leonard*, however, is inapposite. The guardian in that case was not present at trial and his appearance had not been filed. The guardian appointed to represent the interests of the minors in the *Leonard* case did not even become involved in the appeal. The court noted that it is the duty of the court to see that the rights and interests of the minors are protected. It stated that a decree can only be entered on adequate proof. In the case at bar the guardian *ad litem*, Patrick Dixon, was present at all relevant proceedings and indicated that he reviewed the petitions prior to the trial court's approving them. It is apparent from the record that both the court and the guardian *ad litem* fulfilled their legal duty in the proceedings below. There was a hearing at which time the court heard evidence, took statements of counsel and rendered its decision. *Leonard* requires no more than this. Carey Nuyen is bound by his guardian's actions absent some wrongdoing.

Another case relied upon by Carey Nuyen involved a guardian *ad litem* who did not fulfill his duties. The case of *Laxy v. Laxy* (1954), 3 Ill. App. 2d 156, 120 N.E.2d 881, is inapposite. In *Laxy*, unlike the case at bar, the guardian did not show sufficient interest in the case. No allegation of a lack of due diligence is made in the case at bar. Even assuming the statute of limitations for a minor to assert his claim extends two years beyond that minor's reaching majority (*Eiseman v. Lerner* (1978), 64 Ill. App. 3d 185, 380 N.E.2d 1033), we see no breach of duty in the case at bar. Nor, as is described below, do we find any acts of misconduct or mismanagement by the executor that warrant removal.

Petitioner's remaining contentions on appeal concern allegations of mismanagement and self-dealing by OSNB. These allegations of misconduct are based on acts of the executor that were specifically approved by the trial court in the court orders of October 25, 1975, and December 30, 1975. As such, the doctrines of *res judicata* and collateral estoppel are applicable to the remaining issues. *Johnson v. Nationwide Business Forms, Inc.* (1981), 103 Ill. App. 3d 631, 633, 431 N.E.2d 1096.

We believe the petitioner is estopped from relitigating these contentions for the following reasons.

Petitioner contends that OSNB must "disgorge" all profits because of its self-dealing. They rely on the case of *Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 432 N.E.2d 841, which asked what the effect was of a land trustee's purchase, after a foreclosure sale of the property but during the redemption period, of the certificate of sale of trust property sold under foreclosure. Our supreme court held that a trustee cannot purchase property free of the trust at a foreclosure sale. However, *Zarkin* involved the trustee of a trust rather than an executor of an estate. While both executors and trustees have fiduciary obligations to the beneficiaries (*Stoke v. Wheeler* (1945), 391 Ill. 429, 63 N.E.2d 492), the executor must serve the creditors of the estate as well (*In re Estate of Lucas* (1977), 48 Ill. App. 3d 1009, 363 N.E.2d 621, *rev'd on other grounds* (1978), 71 Ill. 2d 277, 375 N.E.2d 112), and, additionally, directly account to the court. Here, where the executor obtained court approval for the same transactions which are now complained of, the *Zarkin* case becomes inapposite. While the fiduciary responsibilities of an executor may be similar to that of the trustee, the executor's duties involve obtaining court approval for certain acts. Because *Zarkin* was concerned with the trustee of a land trust rather than an executor of an estate it is not applicable to the situation in the case at bar. Further, the facts in *Zarkin* are totally distinguishable from the case at bar.

■ Petitioner also contends that the executor committed certain acts which would require its removal independently of any conflict of interest. Section 23—2 of the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 23—2) sets forth the statutory standards for removal of the representative of an estate. Petitioner contends first, that the disposition of the dental practice two weeks after decedent's death was conduct which failed to meet the standards required of an administrator; *i.e.*, utmost good faith and the skill an ordinarily prudent man bestows on his own affairs. (*In re Estate of Lindberg* (1981), 98 Ill. App. 3d 212, 215, 424 N.E.2d 1161, 1163.) However, considering the testimony of Dr. Osterberger and the fact that the dental practice required immediate attention in order for it to continue and not be a serious liability, we believe the disposition of the practice, including the agreement to pay the decedent's debt for dental equipment, was reasonable under the circumstances. Although OSNB did not make an audit to determine the value of the dental practice, it apparently deferred to Dr. Osterberger, who was clearly a highly specialized expert in the field of orthodontics. This, together with the fact that Dr. Osterberger worked with his accountant and had become

involved in evaluating the practice at the request of petitioner, leads us to the conclusion that there was no breach of fiduciary duty in turning the practice over to Dr. Prince. As indicated, while the practice may have had 600 active patients, it is apparent that substantial work had been paid for that had yet to be completed. Therefore, it would be clearly possible for the practice to be a liability rather than an asset.

■■ Petitioner's next allegation of a breach of fiduciary duty concerns the renegotiation of the contract for the sale of Wellwood. As the trial court indicated the Wellwood dealings resulted in a complex situation, made even more complicated by the death of the testator. It is clear that the purchasers under the Wellwood contract were unable to make their payments and OSNB had to take some action. It chose to loan the estate $320,000. Petitioner contends that OSNB either "forgave or forgot" and failed to account for the interest due from the purchasers on the original contract which should have amounted to $28,771. She contends that OSNB listed no income for the year 1973 when the original contract was still in force. Further, she points out that the first account, filed in 1979, does not show any interest income obtained from the estate from the original contract. Even the trial court noted that the disposition of interest on the original contrct was unclear to the court. However, the trial court went on to say the interest went to the Aurora National Bank to apply on the decedent's indebtedness. As indicated previously the purchasers of Wellwood obtained a loan from Aurora National Bank. Decedent's AT&T stock was pledged as security on the loan. When the Wellwood purchasers defaulted, the Aurora National Bank was in a secured position. There is no evidence in the record to suggest anything to the contrary. Most importantly, it should be noted that the renegotiated contract was finally successfully consummated.

■■ Petitioner's next contention is that the executor committed gross mismanagement in handling the Federal estate tax obligation. She contends that OSNB's failure to obtain an extension for the payment of the tax was wasteful of estate assets. Petitioner's expert, Edward Sieracki, gave the opinion that the extension would have been granted by the Internal Revenue Service. On the other hand, OSNB's representatives testified that it was unclear the extension would be granted. However, the executor did consult with an IRS field auditor and made an effort to get an opinion as to whether or not the second extension would be granted. The executor contends that what it did was to opt for the safer route, obtain court approval for a loan and use the funds to pay the Federal estate taxes and other

liabilities. The trial court noted that the failure to obtain this extension may indicate at least poor judgment on the part of the executor. However, the court did go on to list a number of mitigating factors, most importantly the fact that there was no certainty that the extension would be granted. Further, the court noted that there were a number of other claims for substantial sums of money outstanding. Petitioner contends that the failure to secure this extension had a double impact. First, she contends it resulted in a tax penalty of $6,180.34. However, although this is not raised by the parties, it is possible that this tax penalty would have been greater had the extension been applied for and turned down. Petitioner also contends that the failure to get the extension resulted in another act of mismanagement, the $320,000 loan.

OSNB contends that the $320,000 loan was vital to the estate in order to avoid having the Aurora National Bank, which had taken assignment of the beneficial interest in the land trust to Wellwood, from foreclosing on Wellwood. The trial court approved the Wellwood renegotiation on December 30, 1975, and approved the renegotiation again on February 22, 1982. We believe the trial court properly found that there was no waste caused by the renegotiation of the contract. Further, it should be noted that the renegotiated contract was finally successfully consummated.

Petitioner next contends that the court erred in denying her request for the complete office files of attorney Charles Myler which relate to his services as attorney for the estate of Nuyen. The trial court ruled that the records need not be disclosed. Petitioner contends that there was an attorney-client relationship between Myler and her and that, therefore, the case of *In re Estate of Wahl* (1920), 218 Ill. App. 295, 302, applies. *Wahl* held that evidence is privileged when it arises from the attorney-client relationship. However, as previously discussed in this opinion there was no attorney-client relationship between petitioner and Myler. Therefore, petitioner's reliance on the *Wahl* case is misplaced.

We think it should be noted that it has been nearly a decade since decedent's death. Because of the allegations of fraud and conflict of interest this court has given careful scrutiny to allegations that petitioner would otherwise have been estopped from raising. Under the circumstances of this case relaxation of the rigid estoppel rules is, we believe, warranted. Nonetheless, our review of the record does not reveal that a conflict of interest existed. Further, while OSNB may have made some errors in the management of the Nuyen estate, none were so great as to warrant removal under the statutes. Ill. Rev. Stat.

228

1979, ch. 110½, par. 23—2.

For these reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

NASH and UNVERZAGT, JJ., concur.