**Susan Kemper HAMILTON, Plaintiff,**

v.

**Arthur C. NIELSEN, Jr., and American National Bank and Trust Company of Chicago, Defendants.**

No. 78 C 2379.

United States District Court,
N. D. Illinois, E. D.

April 13, 1981.

Albert C. Lum, Lum & Ku, Los Angeles, Cal., Richard L. Horn, David R. Melton, Karon, Morrison & Savikas, Chicago, Ill., for plaintiff.

Lawrence W. Dam, Los Angeles, Cal., John E. Angle, Kirkland & Ellis, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASPEN, District Judge.

This cause coming on for trial without a jury and the Court having considered the sworn testimony of the witnesses, the exhibits received in evidence, argument of counsel, the relevant authorities, and being fully advised in the premises makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52:

*FINDINGS OF FACT:*

1. Plaintiff, Susan Kemper Hamilton ("Plaintiff"), is a citizen of California currently residing in Switzerland.

2. Defendant, Arthur C. Nielsen, Jr. ("Nielsen"), is a resident of Illinois.

3. Defendant, American National Bank and Trust Company ("the Bank"), is a national banking association with its principal place of business in Chicago, Illinois.

4. The matter in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

5. Plaintiff is one of several surviving children of Milton J. Hamilton who died on October 16, 1972, a resident of Lake County, Illinois.

6. On March 9, 1961, prior to his death, Milton J. Hamilton created an insurance trust ("the Trust") naming the Bank as trustee. By a subsequent amendment, Nielsen was named advisor to the trustee. The Trust provided that after the death of Mr. Hamilton and his mother, now both deceased, the Trust would be divided equally among five beneficiaries, one of whom is the plaintiff. The Trust authorized the trustee, subject to the authority of the advisor, to retain any property it received and to sell such property at private sale.

7. Mr. Hamilton's will was executed on September 20, 1972, and it was admitted to probate in Lake County, Illinois, on November 9, 1972. The will contained a "pour over" provision whereby the residue remaining after the payment of taxes, costs, claims, and specific legacies (hereinafter referred to as the "cash requirements") was to go to the Bank as trustee of the Trust. The will also authorized the executors to sell, retain, or invest property, or continue present investments upon such terms and in such manner as they deemed best, free from any limitations imposed by law and without order of any court. The will named the Bank and Nielsen as co-executors.

8. As co-executors, the Bank and Nielsen were responsible for meeting the estate's cash requirements out of the assets of the estate and funneling any residual assets to the Trust for the benefit of the five beneficiaries.

9. Among the assets of the Milton J. Hamilton estate were 58,718 shares of stock in Frank B. Hall and Company ("Hall"), 31,680 shares of Zenith United Corporation ("Zenith"), and a nontransferable option to acquire an additional 9,375 shares of Zenith at $2.72 per share on or before December 27, 1972. The executors exercised the option before it expired in December, 1972, when Zenith was trading at between $4⅝ and $5.00 per share.

10. At the date of Mr. Hamilton's death, the 58,718 shares of Hall stock had a trading value of $1,548,687.25 at $26⅜ per share.

11. During the administration of the estate, the executors made the following sales of Hall stock:

| DATE | NO. OF SHARES | | PRICE PER SHARE | COMMISSIONS | NET PROCEEDS |
|---|---|---|---|---|---|
| 1/29/73 | 11,000 | | 19⅛ | $2,750.00 | $207,625.00 |
| 6/13/73 | 5,000 | | 12 | | 60,000.00 |
| 7/17/73 | 5,000 | | 13¼ | | 66,250.00 |
| 9/04/73 | 5,000 | | 15 | | 75,000.00 |
| 2/18/75 | 4,700 | | 14⅝ | 775.50 | 67,962.00 |
| 2/18/75 | 300 | | 14⅞ | 49.50 | 4,413.00 |
| 4/21/75 | 4,000 | (3,900) ( 100) | 16¼ | 874.09 | 64,113.41 |
| 5/09/75 | 6,000 | | 17⅞ | 1,213.07 | 106,036.93 |
| 5/20/75 | 368 | ( 300) ( 68) | 18⅛ | 124.34 | 6,537.16 |
| TOTALS | 41,368 | | | $5,786.50 | $657,937.50 |

12. During the administration of the estate, a total of 17,350 shares of Hall stock were transferred to the Trust as follows:

| DATE | NO. OF SHARES | VALUE OF STOCK AT TIME OF TRANSFER | VALUE PER SHARE AT TIME OF TRANSFER |
|---|---|---|---|
| 9/30/73 | 10,000 | $150,000.00 | 15 |
| 1/22/75 | 1,350 | 16,368.75 | 12⅛ |
| 4/16/75 | 1,000 | 17,187.50 | 17⁷⁄₁₆ |
| 5/01/75 | 5,000 | 91,250.00 | 18¼ |
| TOTAL | 17,350 | $274,806.25 | |

13. The Trust then made the following sales of Hall stock:

| DATE | NO. OF SHARES | PRICE PER SHARE | COMMISSIONS | NET PROCEEDS |
|---|---|---|---|---|
| 1/17/75 | 4,017 | 11⅝ | | $46,697.63 |
| 1/17/75 | 985 | 11⅝ | | 11,450.62 |
| 4/16/75 | 483 | 17⅛ | 96.76 | 8,174.62 |
| 4/16/75 | 4,119 | Approx. 17⅛ | unknown | 69,712.38 |
| 4/16/75 | 1,373 | Approx. 17⅛ | unknown | 23,460.06 |
| 4/16/75 | 1,373 | Approx. 17⅛ | unknown | 23,259.42 |
| 5/02/75 | 5,000 | 17⅞ | $1,010.86 | 88,364.15 |
| TOTALS | 17,350 | | | 276,118.88 |

14. The Trust and estate received a total of $934,056.38 from the sales of the Hall stock.

15. At the date of Mr. Hamilton's death the 31,680 shares of Zenith stock had a trading value of $160,380.00 at $5⅛ per share.

16. After the estate exercised the option to acquire an additional 9,375 shares of Zenith stock in December, 1972, the estate held a total of 41,055 shares. The estate borrowed $25,500.00 from the Trust in order to exercise the option at $2.72 per share. At the time the option was exercised, the 9,375 shares had a trading value of approximately $46,875 at $5.00 per share, representing a potential capital gain of over $20,000 for the estate.

17. The entire Zenith holding was sold by the estate to Zenith at $2.00 per share on December 14, 1976, without commissions, for a total of $82,110.00. No Zenith stock was ever transferred to or sold by the Trust.

18. The market for both Hall and Zenith stock was relatively limited or "thin" which inhibited the ability of the executors to make large block sales of the stock at favorable prices. Zenith was traded over the counter at all relevant times and the Hall stock was traded over the counter until December, 1973, when it was listed on the New York Stock Exchange.

19. Between September 1, 1972, and the end of December, 1973, the average weekly volume of trading in Hall stock was approximately 66,000 shares while the average weekly volume in Zenith stock was approximately 3,700 shares, less than one-tenth of the estate's entire Zenith holding.

20. The Internal Revenue Service acknowledged the limited marketability of the Zenith stock by allowing a "blockage discount" of $1.00 per share on the ultimate sale of the stock to Zenith in 1976 which represented 22.7% of the market value of the stock.

21. The free transferability of the Hall stock was initially in doubt since it was "lettered stock" not registered under the applicable federal or state securities laws at the time it was acquired by Mr. Hamilton in a tax free reorganization of his insurance agency. By letter dated December 15, 1972, outside legal counsel advised the executors of the Hamilton estate that the stock could be sold free and clear of any restrictions provided that the Hall company was notified and acquiesced in the transfer. Although Hall was notified in a timely manner, the company did not remove the restrictions on the stock certificates until late February, 1973, nearly one month after the first sale of the stock on January 29, 1973, accomplished pursuant to Rule 144 of the Securities and Exchange Commission.[1]

1. Rule 144 provides a means of resale of securities acquired directly or indirectly from issuers or from affiliates of such issuers in transactions not involving public offering (so called "restricted securities") and securities held by affiliates or controlling persons. See generally Jen-

22. The Bank assigned experienced and competent officers to administer the day-to-day affairs of the estate who frequently reviewed the cash requirements of the estate as they changed over time, the marketability of the securities that formed the major portion of the corpus of the estate, the tax consequences of particular transactions, and who constantly and conscientiously considered the course of action that would reap the maximum potential benefit for the resulting Trust and its beneficiaries, including the plaintiff herein.

23. A thorough review of Hall, an insurance brokerage company, and Zenith, an insurance company,[2] undertaken by the Bank in late 1972 revealed that they were both inherently sound companies with relatively favorable prospects for the future.

24. The Bank determined that the Hall stock, which comprised 72% of the estate's holdings, would be the logical source of funds with which to satisfy the cash requirements of the estate. As the cash requirements of the estate changed, however, in part due to the declining value of the estate's holdings and the corresponding decrease in the estate tax liability, the Bank resolved not to precipitously dump either the Hall or Zenith stock in a limited and falling market so as not to further adversely affect the price.

25. The executors had substantially satisfied the cash requirements of the estate by mid-1973 through the sale of various real estate and other security holdings of the estate and a partial liquidation of the Hall stock in January, June, and July of 1973.

26. In 1973, stock in insurance brokerage companies declined generally in a "bear market" that preceded the decline that affected the stock market as a whole in 1974. The stock of one well known brokerage company, Marsh & McLennan, reached $69 in February, 1972, declined to $30½ in February, 1973, and was still selling in the $30 range in 1974. The Dow Jones index of selected companies was in excess of 1,000 in

January, 1973, but it declined to 570 in December, 1974. 1974 was the worst year in the stock market since the crash in 1929.

27. The executors received two offers in the first months of the administration of the Hamilton estate, both of which exceeded the price at which the Hall and Zenith stock was eventually sold. In early December, 1972, Burnham & Company offered to buy the Hall stock at one point under bid or approximately $25¾ per share. At about the same time, The Illinois Company, Inc. expressed interest in the block of Zenith stock which was trading at approximately $5 per share at the time.

*CONCLUSIONS OF LAW:*

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

2. As co-executors of the Hamilton estate, the Bank and Nielsen owed fiduciary duties of care to the plaintiff. *Estate of Venturelli v. Granville National Bank*, 54 Ill.App.3d 997, 12 Ill.Dec. 667, 370 N.E.2d 290, 293 (3d Dist. 1977); *Estate of MacLeish v. MacLeish*, 35 Ill.App.3d 835, 842, 342 N.E.2d 740, 746 (1st Dist. 1976).

3. The actions of the co-executors in administering the estate must be judged under the "prudent man" rule which, as articulated by the Illinois Supreme Court, requires that an executor act:

> with the highest degree of fidelity and with the utmost good faith, but he is held to the exercise of only that degree of skill and diligence which an ordinarily prudent man bestows on his own similar private affairs. Nothing more can be required of him, and, if his acts will stand the test of that rule, he cannot be held liable for any loss that may be sustained by the estate of his intestate.

*Christy v. Christy*, 225 Ill. 547, 80 N.E. 242, 243 (1907); *Estate of Venturelli, supra*, 54 Ill.App.3d 997, 12 Ill.Dec. 667, 370 N.E.2d at 293.

4. A corporate executor is held to the same standard of care as an individual executor. *Estate of Venturelli, supra.*

---

nings & Marsh, Securities Regulation at 407–19 (4th ed. 1977).

**2.** At the time of his death, Mr. Hamilton was chief executive officer of Zenith.

5. Although an executor or trustee must act in a prudent fashion, it is clear that neither is an insurer or guarantor of the assets with which he is charged. As Judge Weinfeld of the Southern District of New York stated in a case very similar to the one at bar, "[n]either prophecy nor prescience is expected of trustees and their performance must be judged not by hindsight but by facts which existed at the time of the occurrence." *Stark v. United States Trust Company of New York*, 445 F.Supp. 670, 678–79 (S.D.N.Y.1978) (citations omitted).

6. "The general rule is that a trustee is presumed to have acted in good faith and to have performed his duties under the trust. The burden of proving his breach of trust rests upon the one asserting it." *Elmhurst National Bank v. Glos*, 99 Ill.App.2d 74, 80, 241 N.E.2d 121 (2d Dist. 1968).

7. Viewing the actions of the executors in the case at bar in light of the applicable legal standards as set forth above, it is clear that the plaintiff has failed to prove by a preponderance of the evidence that either Nielsen or the Bank breached their fiduciary duties during the administration of the Hamilton estate. Rather, plaintiff, with the benefit of hindsight, attempts to fix the point at which the Hall and Zenith stock should have been sold and at which other actions should or should not have been taken so that, in retrospect, the yield to the resulting Trust would have been maximized. In the "best of all possible worlds," as Pangloss would say, the stock would have been sold at its peak and the exercise of the Zenith option would have yielded in excess of a $20,000 profit.³ However, the plaintiff has not shown that the course of action followed by the executors was imprudent in light of all the facts and circumstances at the time or that they failed to act with the utmost good faith, diligence, and skill in administering the estate as they would their own private affairs. The only culprit in this case appears to be the unpredictable stock market whose fluctuations have made some men millionaires and caused others to lose their fortunes overnight.

8. The executors did not act unreasonably in handling either the Hall or Zenith stock in a period of declining market values. Moreover, it was also not unreasonable to exercise the Zenith option, even with borrowed funds, at a time when the stock was trading at almost twice the option price. Neither can the executors be faulted for not selling the stock holdings to Burnham & Company or The Illinois Company during the infancy of the estate when the general prognosis for both stocks was relatively optimistic.

9. Apropos to the case at bar are Judge Weinfeld's comments in *Stark v. United States Trust Company of New York, supra,* a case involving some of the same issues as the instant case during the same relevant time period of general market decline. The court said:

> But of probably greatest relevance is the substantial body of case law uniformly rejecting the notion that the decline of a stock's market price forbids retention by a trustee of a trust's holding in that stock. It is not inherently negligent for a trustee to retain stock in a period of declining market values, nor is there any magic percentage of decline which, when reached, mandates sale. Indeed, the market fluctuations have expressly been rejected as a trustworthy indicia of a holding's value—especially in times of general economic decline. Similarly, the fact that a stock may not be desirable for long term investment does not mean that a trustee is under a duty to sell it at the first possible opportunity.

445 F.Supp. at 679 (citations omitted).

## JUDGMENT ORDER

Accordingly, judgment is entered in favor of defendants and against the plaintiff, costs to be borne by the respective parties. It is so ordered.

---

3. *Voltaire, Candide, Zadig, and Selected Stories* (Donald Frame tr. 1961).