141 Ill. App.3d 750 (1986)
492 N.E.2d 884
In re ESTATE OF JOHN T. PIRIE, JR., Deceased (Dale Pirie Cabot et al., Plaintiff-Appellees,
v.
The Northern Trust Company, Defendant-Appellant).
No. 84-0466.
Illinois Appellate Court  Second District.
Opinion filed March 18, 1986.
*751 *752 Patrick W. O'Brien, Howard M. McCue, P. Terrence Buehler, Stephen M. Shapiro, and Haten H. El-Gabri, all of Mayer, Brown & Platt, of Chicago, for appellant.
Linda L. Listrom, Nicholas D. Chabraja, and Ann E. Campbell, all of Jenner & Block, of Chicago, for appellees.
William R. Dillon, Barry C. Kessler, and D. Rainell Rains, all of Concannon, Dillon, Snook & Morton, and Paul L. Bolton, Robert F. DiSilvestro, and Lynn A. Goldstein, all of Chicago, for amicus curiae.
Reversed and remanded.
JUSTICE LINDBERG delivered the opinion of the court:
Defendant, Northern Trust Company, appeals from a judgment of the circuit court of Lake County entered on a jury verdict in favor of plaintiffs Dale Pirie Cabot, Suzanne Pirie Pattou and Sharon Pirie Sands in the amount of $1,569,778. Defendant raises five issues for review: (1) whether the trial judge erred by instructing the jury that defendant's conduct as an executor should be evaluated under a prudent-investor standard of care; (2) whether the trial court erred by permitting plaintiffs' expert witness to testify about the duties of an executor; (3) whether the trial court erred by denying defendant's motion for a directed verdict and its motion for judgment notwithstanding the verdict when plaintiffs failed to adduce any evidence of imprudence under the correct legal standard; (4) whether the trial court erred by denying defendant leave to amend its answer to plead the defense of failure to mitigate damages and by refusing to instruct the jury on the mitigation of damages issue; and (5) whether the trial court erred by refusing to instruct the jury that it should consider the Pirie will and trust in determining whether defendant fulfilled its fiduciary duties. We agree with defendant that the jury was not instructed *753 properly and, therefore, reverse the judgment and remand this cause for a new trial.
Plaintiffs, as three beneficiaries of the estate of the late John T. Pirie, Jr. (Pirie), brought this action alleging that defendant, as executor of the Pirie estate, breached its fiduciary duty by failing to diversify the estate's common stock holdings. Pirie died on November 10, 1980, and his wife, Ginevra Pirie, died one month later, leaving plaintiffs as the only beneficiaries of the residuary of the estate.
Pirie established his testamentary scheme through a will and a declaration of trust, both dated December 7, 1978. The will conveys the residuary of the estate to the trustee acting under the declaration of trust. The will gives the executor broad powers to invest the assets of the estate before distribution, including the power to invest in common stock.
Apart from several modest specific bequests, Pirie's declaration of trust creates five separate funds. Funds one and two, which created a life estate for Pirie's wife, were to hold the residential real estate and one-half the residuary respectively. The trustee was obligated to manage these funds for the benefit of Pirie's wife during her lifetime. In connection with its management obligation, the trustee was given the general power, according to the language of the declaration of trust, to retain stock "although not of the type, quality or diversification considered proper for trust investments." The executor under the will was not given a similar power, although the will provided that the estate should be administered "as my executor deems proper."
The remaining one-half of the residuary was to be divided equally among funds three, four, and five, each of which was created for the benefit of one of Pirie's daughters. Upon his wife's death, all of the property in funds one and two was to be conveyed in equal shares to funds three, four and five. Because Pirie's wife died very soon after her husband, the estate assets were never retained in the trust, but instead were conveyed from the estate to the trust and then were distributed immediately to the beneficiaries. Defendant was appointed as executor on December 30, 1980, and served in that capacity for more than three years.
By January 26, 1981, Ronald Harkness, a vice-president of defendant, had determined the estate's gross value was $6 million including: (1) 114,150 common shares of Carson Pirie Scott & Company, valued at $2.4 million; (2) 40,955 common shares of Universal Resources Corporation, valued at approximately $1.6 million (as a result of a three-for-two stock split on January 27, 1981, the estate on February 1, 1981, held 61,492 shares of Universal Resources common *754 stock); (3) John Pirie's one-half interest in a home in Lake Forest, valued at approximately $400,000; (4) a house affiliated with a hunting preserve in South Carolina; (5) municipal bonds valued at approximately $520,000; and (6) miscellaneous marketable common stocks held in various corporations. In January 1981, defendant estimated the estate would owe $3 million in Federal and State inheritance taxes and costs of administration.
In planning the estate administration program, Harkness in January 1981 discussed the estate in separate conversations with each beneficiary and her husband, emphasizing the need to liquidate assets of the estate to satisfy tax and debt obligations. Harkness also discussed the options available to raise money to pay these obligations. The sale of the municipal bonds would yield only $500,000 and Harkness told plaintiffs that they could not plan on selling the real estate in time to pay the taxes. According to Harkness, this meant that the estate would have to sell either the Carson stock, the Universal Resources stock, or some combination of both.
Harkness informed plaintiffs that an employee of Universal Resources told him by telephone that the Universal Resources stock held in the estate could not be sold because of a restrictive legend on the shares. Accordingly, plaintiffs agreed that the Carson stock and the municipal bonds would have to be sold to pay taxes. The parties stipulated at trial that "under the federal securities laws, the Universal Resources stock held by the estate of Pirie could have been sold at any time from 1980 to the present upon the filing of Form 144 with the Securities and Exchange Commission."
On February 27, 1981, Harkness sent all three beneficiaries a letter summarizing the assets held by the estate, its tax liabilities and the plan for administering the estate. That letter stated:
"Each of you has indicated to me orally that you approve to [sic] the sale of 84,150 shares of Carson stock by the estate and will wish to sell the 10,000 shares of Carson's to be received by you.
* * *
Each of you has also indicated to me that you desire the retention of the 40,995 shares and 5,625 warrants to purchase additional shares of Universal Resources Corp.
The shares of Universal Resources Corp. may [emphasis in original] be restricted shares in that they have not been registered under the Securities Act of 1933 and therefore may not be readily sold as free stock. We doubt this to be the case, however. In addition, Mr. Pirie was a founding shareholder and a *755 member of the Board of Directors. We are reviewing the legal requirements as to sale and also the possibility of a lower than market tax valuation for death tax purposes due to such restriction. We will examine the advisability of exercising the 5,625 Universal Resources Corp. warrants.
* * *
We ask that you each confirm your agreement with the proposals set forth above, especially the handling of the Carsons and Universal shares, by signing and returning the enclosed copies of this letter."
Each plaintiff signed and returned a copy of this letter; Dale Pirie Cabot included the following notation on her returned copy.
"I approve except that I have never stated I desire the estate to retain the Universal Resources Corp. shares. I understand the possible legal restrictions on the sale of these shares. On the other hand to the extent these shares can legally be sold or the warrants exercised and the shares so received sold, I do not object if the bank in its fiduciary capacity feels this is the best from the investment standpoint."
Pursuant to this plan, defendant had by the end of March 1981 sold the municipal bonds, the 84,000 shares of Carson stock, and had distributed or sold 10,000 additional shares of Carson stock for each beneficiary. Defendant sold the South Carolina property in April 1981. In consequence, the only significant assets remaining in the estate were the Universal Resources stock, worth approximately $1.7 million, and the estate's interest in the Lake Forest home worth approximately $400,000.
In March 1981, an investment advisor of Sharon Sands spoke with Harkness to express his opinion that Universal Resources stock was not a good investment and on June 24, 1981, Sharon Sands and Dale Cabot sent a letter to defendant's chairman expressing concern about the prudence of holding the stock. In response, Raymond George, defendant's senior vice-president of fiduciary services, communicated by telephone with Sharon Sands and her husband that defendant was prepared to sell the Universal Resources stock if plaintiffs so indicated, preferably in writing. George indicated defendant had retained the Universal Resources shares because the beneficiaries had requested retention and explained that defendant had not taken "an investment portfolio approach" to the stock holding because it had not been asked to do so and because defendant did not know each plaintiff's individual assets or objectives.
In August 1981, Franklin Sands informed George that plaintiffs *756 desired distribution of 5,000 shares each of the Universal Resources stock. In response, Harkness wrote a letter to plaintiffs dated August 25, 1981, informing them of the income tax consequences of the distribution and suggesting three available alternatives: (1) no distribution or sale; (2) distribution of the 15,000 shares with the corresponding income tax consequences; or (3) deferral of the tax consequences by selling the shares and reinvesting the proceeds in defendant's short-term investment fund until after March 1, 1982. Plaintiffs did not respond to this letter, which Harkness interpreted as their collective decision to select the first option.
Through a letter drafted by Charles Cabot, husband of Dale Pirie Cabot and an attorney, which was dated March 15, 1982, plaintiffs asserted that defendant had breached its fiduciary duty by failing to sell the Universal Resources stock and to diversify the estate. Through George, defendant responded to plaintiff's assertions in a letter dated April 26, 1982, in which he attempted to clarify "the background of this situation."
In August 1982, plaintiffs brought this suit against defendant. According to plaintiffs' verified complaint, defendant mismanaged the estate's assets and failed "to protect the estate's portfolio against unnecessary and unreasonable risk by failing to sell shares in Universal Resources and to invest the proceeds in diversified investment vehicles." Plaintiffs claimed damages in the amount of $1.6 million based upon the decline in the market value of the estate's investment in Universal Resources and asserted that "[t]his loss would not have occurred but for defendant's failure to diversify the estate's overconcentration of investment in the common shares and warrants of Universal Resources by selling those shares and warrants and reinvesting the proceeds in other investments which would have spread the portfolio's risk over diverse investment vehicles." Based solely upon these allegations, plaintiffs requested the court to enter an order declaring that defendant owed a fiduciary duty to plaintiffs to properly manage, invest and protect all estate assets and that defendant was liable to plaintiffs in damages because of its failure to diversify the estate's assets.
The complaint contains no allegations that defendant breached its fiduciary duty by failing to monitor the performance of Universal Resources or by failing to anticipate the decline in the stock. The facts in the record indicate that defendant consulted with its own investment analysts and with outside analysts knowledgeable about Universal Resources, and the consensus was that the outlook for Universal Resources stock was positive. At the conclusion of the trial, the jury *757 returned a verdict of $1,569,778 in favor of plaintiffs. Defendant filed a post-trial motion on March 23, 1984, which was denied on April 12, 1984, and defendant thereafter filed a timely notice of appeal.
 1 Defendant's first assignment of error is that the trial court improperly instructed the jury regarding an executor's standard of care in managing an estate. Jury instruction J-8 concerning defendant's standard of care is challenged as imposing upon defendant as an executor a duty to invest the assets of the Pirie estate. Such a duty to invest, defendant asserts, is not recognized by Illinois law. Instruction J-8 reads:
"As executor of the estate, The Northern owed a fiduciary duty to the beneficiaries. By fiduciary duty, I mean that in dealing with the estate, The Northern had a duty to act with the highest degree of fidelity, with the utmost good faith, and with that degree of skill and diligence which an ordinary prudent man would exercise in dealing with and managing his own property. In managing the estate, the Northern Trust was under a duty to exercise the same care and skill that an investor of ordinary prudence would exercise in dealing with his own property." (Emphasis added.)
Defendant objects to the last sentence of J-8.
Plaintiffs initially respond that defendant has waived its challenge to J-8 by failing to articulate at trial a specific objection. Plaintiffs' argument is without merit. In this case, the parties held an initial conference on instructions prior to trial. As defendant emphasized in its reply brief, at the first conference on instructions held on December 21, 1983, defendant objected to the word "investor" as misleading and as duplicative of another instruction. During the conference, the trial court acknowledged that defendant objected to the word "investor." During a subsequent conference on instructions on January 17, 1984, the court reiterated what had transpired earlier that morning in discussions with counsel regarding the instructions generally and specifically instruction J-8.
"Also, Mr. O'Brien [defendant's counsel] wanted it absolutely clear in the record that prior objections that he made to what has been designated as J-8, which will be given, is a sentence that contains the word `investor' in it, and his objection is not only to the word `investor' in that sense, but that the entire sentence to the  basically to the effect that the Northern had a duty to act as an investor would with its own funding is along those lines, and Mr. O'Brien's objection to that sentence being included in J-8, the Court has previously ruled that that instruction *758 maybe [sic] given over the defense objections."
Plaintiffs assert defendant has waived this issue because it did not object to J-8 on the specific basis that it incorrectly charged the bank with a duty to invest. To the contrary, the above-quoted language of the trial court indicates defendant made a specific objection to J-8 based upon the "investor" duty. Plaintiffs by their reliance on H. Vincent Allen & Associates v. Weis (1978), 63 Ill. App.3d 285, 379 N.E.2d 765, suggest that the objection is waived because the record does not contain defendant's objection, but rather only the reiteration of defendant's argument by the trial judge. In Weis, the objection made in the lower court to the instruction challenged on appeal was not recorded, thereby leaving the reviewing court "totally uninformed as to the objections made by counsel for defendant to this instruction at the conference." (63 Ill. App.3d 285, 293, 379 N.E.2d 765, 771.) Here, in contrast, the trial judge's comments identify defendant's objection to J-8. Additionally, in Weis, the court emphasized that the record failed to establish that the defendant ever tendered an alternative instruction. (63 Ill. App.3d 285, 294, 379 N.E.2d 765, 771.) In the instant case, defendant offered an alternative instruction which was in part accepted by the court and tendered to the jury. Accordingly, we find plaintiffs' waiver argument unpersuasive and thus, conclude defendant has properly preserved for appellate review its contention that J-8 incorporates an incorrect standard of care.
Generally, an executor has a fiduciary duty to act with the highest degree of fidelity and utmost good faith in handling estate assets. (In re Estate of Neisewander (1985), 130 Ill. App.3d 1031, 474 N.E.2d 1378.)[1] Such fiduciaries must perform their responsibilities with the *759 degree of skill and diligence which an ordinary prudent man bestows on his own similar private affairs. (Christy v. Christy (1907), 225 Ill. 547, 553; see Hamilton v. Nielsen (7th Cir.1982), 678 F.2d 709, 711.) This rule enunciated in Christy is the basis for the first two sentences in J-8. The question remains whether Illinois law imposes upon an executor the duty to manage an estate with the skill and care of an investor of ordinary prudence; the duty enunciated in the second sentence of J-8.
The parties have not cited and our research has not disclosed any Illinois case in which an executor's conduct has specifically been judged by this prudent-investor standard. Employing formulations of the prudent-man standard, Illinois courts in two instances have surcharged an executor for failure to sell stock held by an estate. In In re Estate of Busby (1937), 288 Ill. App. 500, 6 N.E.2d 451, for example, the testator left a gross estate invested in securities with an approximate value of $1,500,000, but the shares were subject to indebtedness of approximately $950,000, thereby leaving a net estate value of slightly more than $500,000. In contrast to the narrower under-diversification theory of liability asserted by plaintiffs here, the decedent's wife in Busby argued and the trial court found that the executor had breached its fiduciary duty because its president had ignored the request of the widow and the recommendation of his own bank's investment committee that the securities be sold. As its opinion makes clear, the Busby court was especially shocked both by the riskiness of the estate's securities because they were bought on margin and by the bank president's decision, predicated solely on his belief *760 that the market would rise, to offer the securities for sale at several dollars per share above the market price. The market did not advance to meet the price set by the bank president, but instead declined steadily and the widow's entire estate was destroyed. In surcharging the executor, the court did not apply a prudent-investor standard, but rather concluded that the bank had failed to meet the test of "`that degree of reasonable diligence ordinarily employed in like business affairs by a man of common prudence * * *.'" People v. Busby (1937), 288 Ill. App. 500, 520, 6 N.E.2d 451, 461.
As authority for this standard of care, the Busby court relied upon In re Corrington (1888), 124 Ill. 363, where the supreme court ruled that an executor was liable for the loss to the estate occasioned by his sale of the estate's real property to his sons for $7 per acre below the reasonable market price. In employing the language from Corrington, the Busby court concluded the Christy standard of care was "not intended, in our opinion, to apply" to the facts and circumstances present in Busby. (In re Estate of Busby (1937), 288 Ill. App. 500, 519, 6 N.E.2d 451, 459.) As its basis for differentiating between Corrington and Christy, the Busby court observed that "[t]he fact that ordinarily prudent men in the conduct of their own private affairs may speculate or even gamble with their own money or property surely cannot be used as a standard by which to measure a fiduciary's duty of care * * *." People v. Busby (1937), 288 Ill. App. 500, 519-20, 6 N.E.2d 451, 459.
At oral argument, plaintiffs suggested the Corrington "like business affairs" standard provides more direct support for the prudent-investor language in J-8 than does the "similar private affairs" language in Christy. Despite the distinction drawn in Busby, we believe Corrington and Christy embody essentially the same standard of care. In enunciating the "similar private affairs" standard in Christy, the supreme court cited Corrington. Moreover, the parties have not cited and our research has not disclosed any Illinois decision since Busoy which has differentiated between the standards in Corrington and Christy.
Even were a distinction to exist, we observe that the recent cases which have discussed an executor's duties under Illinois law have either cited Christy for the standard of care or have recited the Christy language. (See Hamilton v. Nielsen (7th Cir.1982), 678 F.2d 709, 711; Hamilton v. Nielsen (N.D. Ill. 1981), 513 F. Supp. 204, 207; In re Estate of Nuyen (1982), 111 Ill. App.3d 216, 225, 443 N.E.2d 1099, 1105; In re Estate of Lindberg (1981), 98 Ill. App.3d 212, 215, 424 N.E.2d 1161, 1163-64; In re Estate of Lindberg *761 (1979), 69 Ill. App.3d 714, 721, 388 N.E.2d 148, 154; In re Estate of Venturelli (1977), 54 Ill. App.3d 997, 1002, 370 N.E.2d 290, 293; see generally Horner, Probate Practice & Estates sec. 343, at 472 (1984). But see In re Estate of Mulvaney (1984), 128 Ill. App.3d 133, 136, 470 N.E.2d 11, 13 ("The standard for determining whether a representative has mismanaged a decedent's estate is whether the representative acted as an ordinarily prudent and cautious person who is the trustee of property of another").) In contrast, the two cases which have cited Corrington recently (Weiss v. Weiss (1983), 113 Ill. App.3d 793, 800, 447 N.E.2d 437, 441; Mueller v. Forsyth (1968), 94 Ill. App.2d 258, 263; 235 N.E.2d 645, 648) did not cite that decision as authority for an Illinois executor's standard of care. In fact, this court in Weiss quoted the "similar private affairs" language in Christy for an executor's standard of care. (Weiss v. Weiss (1983), 113 Ill. App.3d 793, 800, 447 N.E.2d 437, 441.) To the extent that any difference exists between Corrington and the supreme court's more recent decision in Christy, therefore, we believe Christy articulates the appropriate standard of care for executors in Illinois. In any event, plaintiffs have not explained how the "like business affairs" language in Corrington supports the second sentence of J-8 to any greater extent than does the "similar private affairs" language in Christy. Accordingly, any support for the prudent-investor standard of care in J-8 must derive from Christy and its progeny.
The Christy standard more recently was applied in In re Estate of Lindberg (1979), 69 Ill. App.3d 714, 388 N.E.2d 148, where the court concluded that the executor bank had breached its fiduciary duty by failing to liquidate the stock within a reasonable time. The principal asset in the estate was a block of 2,000 shares in a one-bank holding company which owned the controlling interest in the executor bank. The beneficiaries refused to accept distribution in kind, thereby imposing on the bank "a duty to liquidate the stock within a reasonable time." (69 Ill. App.3d 714, 724, 388 N.E.2d 148, 156.) Because the executor was unable to distribute the shares and knew that the price of the stock was falling, the court concluded the executor should have made efforts to locate buyers who, the evidence established, were available and who were interested in purchasing the bank's stock. In surcharging the executor, the Lindberg court distinguished decisions absolving executors, administrators, and trustees from liability for mere price fluctuations on the basis that in those cases, the price fluctuation was either unforeseeable or believed to be temporary. (69 Ill. App.3d 714, 725, 388 *762 N.E.2d 148, 157.) Lindberg does not support J-8 because the court there did not apply a prudent-investor standard, but rather imposed a duty upon the defendant bank to exhibit the degree of skill and diligence which an ordinary prudent man would bestow upon his own similar affairs. (69 Ill. App.3d 714, 721, 388 N.E.2d 148, 154.) Moreover, Lindberg is distinguishable factually from the case at bar. There, the court concluded the executor had a duty to sell the shares within a reasonable time because the beneficiaries had refused to receive the shares in kind. (69 Ill. App.3d 714, 724, 388 N.E.2d 148, 156.) As plaintiffs here never refused an in-kind distribution of the shares and apparently received the shares when the estate was closed, Lindberg does not support imposition of a duty to sell here. Another distinguishing fact is that in Lindberg, the court found that the executor had no reason to believe that the decline in the stock was temporary. In contrast, here the record contains evidence that the analysts with which defendant consulted informed defendant that Universal Resources was a strong company and that the outlook for the company was favorable.
 2 Because the actions of the executors in both Busby and Lindberg were so unreasonable in light of the facts in those cases, the appellate court found liability under different formulations of the prudent man standard. As the parties have not cited nor has our research disclosed one Illinois case applying or refusing to apply the prudent-investor standard in assessing the action of executors, we conclude such a common law standard does not apply to Illinois executors.
While the existence of a prudent-investor standard applicable to executors is not supported by Illinois case law, an executor's duties and responsibilities are governed in part by statute. A statutory prudent-investor standard does govern trustee conduct in Illinois. (Ill. Rev. Stat. 1983, ch. 17, par. 1675.) We therefore consider whether despite the absence of a common law prudent-investor standard, defendant was nonetheless subject to a duty to act as a prudent investor based upon application of the statutory trustee standard of care to Illinois executors.
A similar question was considered by the California Supreme Court in Estate of Beach (1975), 15 Cal.3d 623, 542 P.2d 994, 125 Cal. Rptr. 570, cert. denied (1978), 434 U.S. 1046, 54 L.Ed.2d 797, 98 S.Ct. 891, where the beneficiaries sought application of the statutory trustee standard of care (Cal. Civil Code sec. 2261(1), (2)) to an executor. The language of the California statute construed in Beach is very similar to the Illinois prudent-investor rule applicable *763 to trustees in Illinois.[2] Ill. Rev. Stat. 1983, ch. 17, par. 1675.
In Beach, the beneficiaries challenged the executor-bank's first account, asserting the estate was entitled to damages for the executor's negligence in not selling stock in the estate while the market price was above its appraisal value or the date of the testator's death. The trial court ruled in favor of the executor. On appeal, the California Supreme Court affirmed, beginning its analysis with a recitation of the common law standard of care by which an executor's handling of the estate is judged:
"`[T]hat degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature.'" (Estate of Beach (1975), 15 Cal.3d 608, 631, 542 P.2d 994, 998, 125 Cal. Rptr. 570, 574.)
This standard is essentially the same as that employed in Illinois. See Christy v. Christy (1907), 225 Ill. 547, 552-53.
The beneficiaries in Beach argued that since the bank was named as both the executor and the trustee of the estate's assets, the bank in its actions as executor was nevertheless subject to the prudent-investor rule which, as applied to trustees, required diversification of trust investments. Specifically, the beneficiaries contended the statutory prudent-investor rule required the bank to diversify the estate's assets by selling the large block of stock. In rejecting their contention, the Beach court observed:
"[C]ontestants overlook or misconceive basic distinctions between the bank's duties as executor and its duties as trustee.
* * *
The executor holds and manages the estate assets incidentally to performance of the various duties of administering the estate, in contrast to the testamentary trustee, whose primary mission is to serve the trust beneficiaries under the terms of the trust." (Estate of Beach (1975), 15 Cal.3d 623, 637-38, 542 P.2d 994, 1003, 125 Cal. Rptr. 570, 579.)
*764 See Hamilton v. Nielsen (7th Cir.1982), 678 F.2d 709, 712 (construing Illinois law) ("[I]t was not the executors who had a duty to diversify the assets; it was the trustee. The executors' duty was to close out the estate as quickly as possible * * *"); compare In re Estate of Sanders (1940), 304 Ill. App. 57, 67-68, 25 N.E.2d 923, 928 (where court cited as evidence of imprudence that the trustee had invested almost the entire trust fund in one investment); Stark v. United States Trust Co. (S.D.N.Y. 1978), 445 F. Supp. 670, 682 (investment decision of corporated trustee cannot be challenged on the basis of lack of diversification); Annot., 24 A.L.R.3d 730 (1969) (duty of trustee to diversify investments and liability for failure to diversify).
The Supreme Court of California in Beach quoted from the trial court's memorandum opinion: "An executor is not a trustee; his duty is to conserve, not to invest." (Estate of Beach (1975), 15 Cal.3d 623, 636 n. 12, 542 P.2d 994, 1002 n. 12, 125 Cal. Rptr. 570, 578 n. 12.) While recognizing that an executor's duty to preserve the estate's assets might at times require the executor to take affirmative steps to prevent deterioration in value, the court stated "an executor or administrator is not liable for any decreases in the value of estate assets on account of his acts or omissions done in good faith and without negligence." (15 Cal.3d 623, 639, 542 P.2d 994, 1004, 125 Cal. Rptr. 570, 580, citing California Probate Code sec. 920; see generally Annot., 92 A.L.R. 436 (1934) (liability of executor for decrease in value of securities because of retention or delayed sale).) The Beach court concluded that the bank had exercised reasonable care in deciding to retain the estate stock.
 3 Despite plaintiffs' contention that "the result in Beach depended upon review of the evidence and questions of fact rather than questions of law," the refusal of the Beach court to apply the prudent-investor rule to the conduct of executors provides support for the conclusion here that instruction J-8  which essentially applied the Illinois statutory prudent-investor rule to defendant  was erroneous. Plaintiffs are correct that ultimately, the California Supreme Court analyzed the facts to determine if the bank had exercised due care. Prior to reviewing the facts, however, the Beach court first expressly decided the legal question, finding that the trial court had applied the correct standard of care in analyzing the executor's conduct. (Estate of Beach (1975), 15 Cal.3d 623, 630, 542 P.2d 994, 998, 125 Cal. Rptr. 570, 574, cert. denied (1978), 434 U.S. 1046, 54 L.Ed.2d 797, 98 S.Ct. 891.) Moreover, two factors in Beach provided a stronger basis for applying a prudent-investor standard there than do the circumstances here. First, the executor in Beach actually managed the assets as trustee and knew it would serve as trustee when it began performing its duties as executor *765 of the estate. As it was aware that it would serve both as executor and as trustee, the executor in Beach arguably had a greater responsibility (i.e., to manage the estate's assets with a longer-term view) than did defendant here who, because of the immediate death of Ginevra, knew it was required by the terms of the trust to distribute the estate's assets directly to plaintiffs after the payment of estate debts. Second, the executor bank in Beach as a professional fiduciary in California was subject to a higher fiduciary standard of care than current Illinois law suggests is imposed upon defendant as a professional fiduciary. (Compare Estate of Beach (1975), 15 Cal.3d 623, 631, 542 P.2d 994, 998, 125 Cal. Rptr. 570, 574, cert. denied sub nom. Edwards v. Superior Court (1978), 434 U.S. 1046, 54 L.Ed.2d 797, 98 S.Ct. 891, with In re Estate of Venturelli (1977), 54 Ill. App.3d 997, 370 N.E.2d 290.) In any event, we find the result reached by the Supreme Court of California persuasive, and thus, conclude the trial court erroneously instructed the jury regarding the proper legal standard of care.
Also supportive of the conclusion that J-8 imposes an incorrect standard of care on defendant is an argument advanced by amicus curiae Corporate Fiduciaries Association of Illinois (CFAI) based on the relevant Illinois statutes. In reviewing the statutes governing trustees, executors, and representatives, CFAI notes that section 5 of the Trusts and Trustees Act imposes upon trustees a duty, when retaining property for any trust, to exercise "the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital." (Ill. Rev. Stat. 1983, ch. 17, par. 1675.) Likewise, section 21-2(a) of the Probate Act of 1975 concerning the investment responsibilities of a representative of a ward's property states: "It is the duty of the representative to invest the ward's money." (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 21-2(a).) In contrast, sections 21-1 through 21-1.06 of the Probate Act of 1975 governing the investment of money in a decedent's estate imposes no such duty upon an executor or administrator.
"In addition to any investments which a decedent may authorize his executor to make by the terms of his will, the representative of his estate, in his discretion, may invest money of the estate of a decedent in any one or more of the investments specified in Sections 21-1.01 through 21-1.06." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 21-1.)
Accord, In re Estate of Swiecicki (1985), 106 Ill.2d 111, 126 (Ryan, J., *766 dissenting) (acknowledging that the Probate Act of 1975 does not require a representative of a decedent's estate to invest the estate's assets); In re Estate of Crowder (1979), 75 Ill.2d 197, 203 ("The Probate Act authorizes, but does not require, the executor to liquidate assets and thereby reduce the personal estate to cash when such action is necessary for the proper administration of the estate"). Sections 21-1.01 through 21-1.06 merely enumerate appropriate investments including savings accounts and direct obligations of the United States. Ill. Rev. Stat. 1983, ch. 110 1/2, pars. 21-1.01 through 21-1.06.
Construction of a statute is a question of law (Oberman v. Byrne (1983), 112 Ill. App.3d 155, 445 N.E.2d 374), and the statutory language should be given its plain and ordinary meaning. (City of East Peoria v. Group Five Development Co. (1981), 87 Ill.2d 42.) When the legislative intent can be ascertained from the statutory language, it will be given effect without resorting to other aids of construction. (People v. Robinson (1982), 89 Ill.2d 469.) The permissive language governing the conduct of executors, when contrasted against the mandatory investment responsibilities of trustees and representatives of wards, indicates that the legislature has not imposed upon executors a statutory duty to invest by liquidating a large block of stock solely for diversification. (Compare In re Estate of Kugler (1984), 117 Wis.2d 314, 322, 344 N.W.2d 160, 164 (Wisconsin statute makes personal representatives, guardians, and trustees subject to a standard of care virtually identical to the Illinois prudent-investor rule); In re Estate of Wiese (Iowa 1977), 257 N.W.2d 1, 4 (court applied statutory prudent-investor rule to executors where statute by its language prescribed standard of care for all fiduciaries).) Moreover, CFAI convincingly maintains that imposition of such a duty upon Illinois executors should result from new legislation and not judicial interpretation.
 4, 5 While we conclude that Illinois does not impose upon an executor a duty to act as a prudent investor either by case law or statute, the question remains whether instruction J-8, which imposes upon defendant a duty to exercise the skill and care of an investor, requires reversal. We conclude instruction J-8 warrants reversal for two reasons: (1) the instruction amounts to an incorrect statement of the standard of care by which an executor's conduct must be judged; and (2) the instruction contains two different standards of care and thus could have misled the jury. As plaintiffs note, jury instructions are to be considered as a whole, and must be read together to determine whether they fairly and accurately state the law. (Palausky v. Landers (1978), 67 Ill. App.3d 985, 987, 385 N.E.2d 751, 752.) However, instructions that incorrectly state the law and mislead the jury should *767 not be given. (Van C. Argiris Co. v. Caine Steel Co. (1974), 20 Ill. App.3d 315, 322, 314 N.E.2d 361, 366.) Reversible error is committed when an instruction imposes a greater duty than that actually required under the law, when the instruction relates to the appropriate degree of skill. (Pappas v. Peoples Gas Light & Coke Co. (1953), 350 Ill. App. 541, 547, 113 N.E.2d 585, 589.) An error concerning the standard of conduct to be applied by a jury in measuring the duty owed by a defendant requires reversal. Hannaur v. Chicago Transit Authority (1960), 25 Ill. App.2d 454, 167 N.E.2d 427 (abstract of opinion); see King v. Casad (1984), 122 Ill. App.3d 566, 461 N.E.2d 685 (improper standard of care instruction required reversal).
Defendant contends instruction J-8 warrants reversal of the jury verdict when read in combination with the evidence introduced at trial because the instruction necessarily convinced the jury that lack of diversification alone constituted a breach of defendant's fiduciary duty. Defendant asserts and plaintiffs do not contradict that Professor Hamada (Hamada) offered the principal evidence introduced by plaintiffs on the issue of defendant's prudence. Hamada is a professor at the University of Chicago Graduate School of Business who teaches in the areas of finance, portfolio analysis, and securities analysis. One portion of the record cited by defendant is Hamada's comparison of the roles of executors and portfolio managers:
"Now I would imagine that among the many duties of an executor or trustee is portfolio management, but an executor has other responsibilities also, I am sure that I am not aware of, and it's just that portfolio management aspect that I believe I am qualified to talk about."
Hamada's testimony, fairly characterized by defendant, was that an executor acts unreasonably when it fails to diversify as would any other portfolio manager. As defendant's record citations establish, plaintiffs repeatedly emphasized during closing argument that the issue before the jury was whether defendant breached its duty to manage the estate assets by failing to diversify. When this testimony is read in light of the prudent-investor duty in J-8, defendant argues, the jury necessarily was influenced by the erroneous standard of care.
Plaintiffs do not attempt to challenge defendant's characterization of Hamada's testimony. Rather, they emphasize that when J-8 is read in conjunction with J-7, "it is clear that the instruction (J-8) does not impose an affirmative obligation on the Northern Trust to invest the assets of the estate."
Instruction J-7 identifies four specific duties of an executor including the duty to properly manage the estate's assets prior to distribution. *768 Instruction J-8 expanded on this duty, providing in part:
"In managing the Estate, the Northern Trust was under a duty to exercise the same care and skill that an investor of ordinary prudence would exercise in dealing with his own property."
Thus, when read together, J-7 and J-8 instructed the jury that defendant had the duty to manage the estate, which included the duty to exercise the care and skill of an investor of ordinary prudence dealing with his own property. The jury could certainly have concluded from these instructions that defendant as executor had a duty to invest. This conclusion is strengthened by the trial court's characterization of plaintiffs' theory of liability tendered to the jury as instruction J-5, which stated in pertinent part:
"Plaintiffs claim that if defendant had been exercising due care and prudence, it would have sold a large portion of the Universal Resources stock and diversified the Estate's holdings, thereby distributing the risk of loss among a variety of assets."
Moreover, plaintiffs throughout their closing argument repeatedly sounded the theme that the block of Universal Resources stock was "a very large concentration" and that defendant had breached its fiduciary duty by failing to diversity the estate's assets (i.e., failed to sell a large portion of the Universal Resources holding and diversify by reinvesting the proceeds in a diversified investment medium). When J-8 is read in the context of the other instructions and the arguments of the parties, therefore, the instruction could readily have been interpreted by the jury as imposing upon defendant a duty to invest the assets of the estate by selling a portion of the Universal Resources stock and diversifying the proceeds.
Also unpersuasive is plaintiffs' contention that J-8 does not impose upon defendant an absolute duty to invest, but only a duty to employ the skill and care of an ordinary prudent investor if it elects to make investment decisions as part of managing the estate. As recognized by defendant, plaintiffs' argument proves too much. Neither party disputes that an executor has a duty to manage the estate, which necessarily involves decisions concerning which assets to sell to satisfy an estate liability and which to retain for distribution. Because every executorship to some degree involves these types of decisions, under plaintiffs' theory every executor would necessarily make some "investment decisions" and thus would be subject to the prudent-investor standard. For example, apart from defendant's sale of certain assets to pay estate liabilities and deployment of proceeds from the sale of assets in its short-term investment fund, defendant did not take any actions as executor to change the assets held in the estate. Nonetheless, plaintiffs *769 assert defendant's retention of the Universal Resources stock was an imprudent investment decision. Under plaintiffs' investment definition, any action of an executor  retention, sale, reinvestment  would trigger application of the prudent-investor standard. Fairly read, therefore, instruction J-8 may have misled the jury with its language that defendant had a duty to exercise the skill and care of a prudent investor.
 6 Apart from its incorrect recitation of the applicable standard of care, the instruction is also subject to challenge in that it could be viewed as containing two different standards by which the jury was directed to assess defendant's conduct. While the second sentence in J-8 essentially is a statement of the rule announced in Christy v. Christy (1907), 225 Ill. 547, the third sentence of J-8 imposes a different and more stringent duty upon defendant; to exercise the skill and care of an investor of ordinary prudence in managing his own property. Even if an instruction correctly states the law, which we have concluded J-8 does not, it cannot be tendered if the instruction would confuse the jury. (Graves v. Wornson (1978), 56 Ill. App.3d 873, 879, 371 N.E.2d 692, 697.) Here, the jury was told to assess defendant's conduct based upon a prudent-man standard and then in the next sentence was directed to assess defendant's management of the estate based on a prudent-investor standard. Inclusion of the two standards within the same instruction may well have confused the jury, and, of course, we cannot determine if the jury applied the correct prudent-man or the incorrect prudent-investor standard in rendering its verdict.
 7 Both plaintiffs and defendant rely upon dictionary definitions of "investor" and "invest" to support their positions regarding the clarity and correctness of instruction J-8. Defendant refers to the definition of investor as one who seeks to commit funds for long-term profit. (Webster's Third New International Dictionary 1190 (1977).) Because an executor is not obligated to earn a long-term profit for the estate, defendant contends, use of the term investor in J-8 was improper and confusing. Plaintiffs counter with a definition of the term "invest" from the same dictionary: "[T]o place [money] with a view to minimizing risk rather than speculating for large gains at a greater hazard * * *." (Emphasis added.) (Webster's Third New International Dictionary 1189 (1977).) Nonetheless, in the definition of "invest" quoted in plaintiffs' brief, the first definition is "to commit [money] for a long period in order to earn a financial return * * *." (Emphasis added.) Since both the definition of investor and the first-listed definition of invest include the element of committing funds for a long-term profit, defendant's argument is persuasive that J-8 may have led the jury to conclude that defendant was required to commit funds of the *770 estate for long-term profit. For these reasons, we conclude the jury's verdict must be reversed because of the incorrect instruction regarding an executor's standard of care.
Defendant also contends that the trial court erred in denying its motions for a directed verdict and judgment notwithstanding the verdict because plaintiffs offered no evidence of imprudence under the correct legal standard. As defendant stated in its memorandum accompanying its post-trial motion: "The verdict cannot stand unless an executor's failure to diversify the assets of an estate is imprudent as a matter of law. There is no such rule of law." (Emphasis in original.) While articulated in defendant's motion for judgment notwithstanding the verdict, this argument is actually directed at the sufficiency of the legal theory in plaintiffs' complaint, and not at the sufficiency of the evidence introduced by plaintiffs in support of their diversification theory. In fact, defendant admitted that the estate's assets were not diversified when it stipulated at trial that after certain assets were sold and certain estate debts were paid, the Universal Resources stock comprised approximately 80% of the estate's assets. Despite this admitted concentration, defendant maintained throughout the litigation in the trial court and maintains to this court that plaintiffs' theory of liability is not cognizable as a matter of law.
Despite defendant's challenge to plaintiffs' legal theory in its motion for summary judgment and in its motion for judgment notwithstanding the verdict, the trial court consistently rejected defendant's challenge. Had plaintiffs' legal theory been rejected by the trial court, plaintiffs likely would have been permitted to amend their complaint. (Ill. Rev. Stat. 1983, ch. 110, par. 2-616.) Amendment likely would have been allowed, because facts exist in the record which may have permitted the jury to find imprudence under the correct legal standard. For example, Harkness explained to plaintiffs in January 1981 that he "was going to do some additional research to find out whether that stock could not be sold," and Sharon Pirie Sands testified Harkness told her he would get back to her regarding the effect of the restrictive legend on the stock. Although the parties stipulated at trial that the Universal Resources stock could have been sold at any time upon the filing of Form 144 with the Securities & Exchange Commission, Harkness in his next communication with plaintiffs by letter dated February 27, 1981, remained unclear on whether the Universal Resources stock could be sold. In this letter, defendant requested plaintiff's consent for the sale of the Carson stock and the retention of the Universal Resources stock. The day before, on February 26, 1981, however, defendant began selling the Carson stock. Plaintiffs' complaint was never *771 amended because plaintiffs' legal theory survived in the trial court and is rejected for the first time on appeal. Were we to reverse the verdict outright and to enter judgment in favor of defendant, plaintiffs would be unfairly denied the opportunity to amend their complaint. We do not think plaintiffs should be denied the opportunity to amend their complaint merely because the invalidity of their legal theory was determined first in the reviewing court rather than at the trial level.
 8 Nor do we think this court should on its own motion order the amendment of plaintiffs' complaint to conform to the proofs. (87 Ill.2d R. 362(f).) While plaintiffs may be able to recast their complaint to support a judgment in their favor based upon the facts as they exist in the record, a jury would not be required to return such a verdict, and thus, any new theory should be considered by a new jury. Moreover, any verdict returned by a jury in favor of plaintiffs based upon a new theory in an amended complaint likely would result in a different damage award. For these reasons, amendment of plaintiffs' complaint in this court would be inappropriate. An appellate court has broad discretion to order a remandment "on such terms as it deems just * * *." (87 Ill.2d R. 366(a).) We deem it just to remand this cause for retrial with directions that plaintiffs be permitted to amend their complaint.
Defendant raises several additional issues in support of its contention that the judgment must be reversed. We initially consider defendant's contention that plaintiffs' expert witness, Hamada, offered irrelevant and highly prejudicial testimony because he lacked competence and expertise on certain subjects. Hamada's testimony was offered as evidence relevant to the prudent-investor standard, which we have concluded was incorrectly applied to defendant. For example, Hamada admitted he was "only an expert in a narrow field of investment analysis, portfolio risk analysis." Also, he stated that he was only qualified to testify concerning the portfolio management responsibilities of an executor. In the event of a retrial, defendant's conduct will not be judged by a prudent-investor standard, but rather by a prudent-man standard. We therefore find it unlikely that the testimony of this witness will be offered again unless a proper foundation is established for his knowledge of how a prudent man would act under the circumstances of this case. (See Estate of Gerber (1977), 73 Cal. App.3d 96, 110, 140 Cal. Rptr. 577, 584.) Accordingly, we do not consider the correctness of the trial court's admission of Hamada's testimony.
We also need not consider the merits of defendant's argument that the trial court should have allowed amendment of its answer to include a mitigation of damages defense. On remand, the trial court will have "the same power over the record which it possessed before its decree *772 or judgment was rendered," including the power to allow amendment of an answer and the introduction of other evidence. (Chickering v. Failes (1862), 29 Ill. 294, 303; see Crane Paper Stock Co. v. Chicago & Northwestern Ry. Co. (1976), 63 Ill.2d 61, 69-70.) Since the trial court on remand is empowered with discretion to consider any motions by the parties to amend the pleadings, we do not address this assignment of error.
Defendant also asserts that the trial court committed reversible error instructing the jury that defendant could be held liable for the income the estate would have received from reasonable and prudent investment of the amount representing plaintiffs' damages. This instruction is predicated on the prudent-investor theory, which we have concluded does not apply to executors in Illinois. Because of the inter-relationship between this damage instruction and J-8 which we have concluded states an incorrect standard of care, we are confident such a damage instruction will not be offered at any new trial based upon a different theory of liability. In light of our disposition, therefore, we need not consider this instruction. In any event, although defendant objected to this damage instruction at trial, defendant never tendered an alternative instruction on the correct measure of damages. Absent a proper alternative instruction tendered by defendant, we conclude defendant has waived this issue. People v. Almo (1985), 108 Ill.2d 54, 66; Auton v. Logan Landfill, Inc. (1984), 105 Ill.2d 537, 549; Saldana v. Wirtz Cartage Co. (1978), 74 Ill.2d 379, 387.
 9 Defendant also complains that the trial court erred in failing to tender defendant's proposed instruction 9A to the jury:
"Under the law, the executor's duties and responsibilities to the beneficiaries may be expanded or limited by the operative documents. Therefore, you should consider the language of Mr. Pirie's Will and his Declaration of Trust in determining whether The Northern fulfilled its duty as executor of Mr. Pirie's estate."
We agree with plaintiffs that defendant has waived this assignment of error by failing to include it in its post-trial motion. Brown v. Decatur Memorial Hospital (1980), 83 Ill.2d 344, 348-49; Patur v. Aetna Life & Casualty (1980), 90 Ill. App.3d 464, 466, 413 N.E.2d 65, 67.
The judgment of the circuit court of Lake County is reversed, and the cause is remanded for proceedings consistent with this opinion.
Reversed and remanded.
REINHARD and HOPF, JJ., concur.
NOTES
[1] Defendant and an amicus cite the rule in Illinois that a corporate executor is held to no higher standard of care than is an individual executor. Although courts have differentiated between corporate and individual executors, the distinction more accurately is described as that between professional and nonprofessional executors. While the rule holding professional and nonprofessional executors to the same standard of care has been recited recently as the law in Illinois (see, e.g., Hamilton v. Nielsen (N.D. Ill. 1981), 513 F. Supp. 204, 207; In re Estate of Lindberg (1979), 69 Ill. App.3d 714, 721, 388 N.E.2d 148, 154), the only authority cited by these courts for this rule is In re Estate of Venturelli (1977), 54 Ill. App.3d 997, 370 N.E.2d 290. (See also In re Estate of Vanderwater (1945), 326 Ill. App. 81, 61 N.E.2d 392 (abstract of opinion) (without citation to authority, court stated that executor which qualified as a trust company and advertised for business was subject to the same standard of care applicable to all other executors).) However, the Venturelli court cites no authority from the supreme court, appellate court, or from any Illinois statute in support of its conclusion. (Cf. In re Estate of Busby (1937), 288 Ill. App. 500, 520, 6 N.E.2d 451, 459 (where the court observed that the executor bank held itself out as especially qualified to administer estates entrusted to its care); Annot., 91 A.L.R.3d 904 (1970) (different standards for professional and nonprofessional trustees where professional trustees market their experience).) Other States do impose a higher standard of care upon professional executors. (See, e.g., In re Estate of Estes (Ariz. App. 1982), 134 Ariz. 70, 74, 654 P.2d 4, 8 (executor bank was subject to higher standard of care than executors without special skills, knowledge and resources); Estate of Baldwin (Me. 1982), 442 A.2d 529, 532 (executor bank held to a higher standard as a professional fiduciary than is a nonprofessional fiduciary); Estate of Beach (1975), 15 Cal.3d 623, 630, 542 P.2d 994, 998, 125 Cal. Rptr. 570, 574 (bank engaged in business of acting as a fiduciary for estates and trusts to professional fiduciary standard of care), cert. denied (1978), 434 U.S. 1046, 54 L.Ed.2d 797, 98 S.Ct. 891.) Because none of the parties have challenged on appeal the Illinois rule that professional and nonprofessional executors are subject to the same standard of care, we need not consider the correctness of the statement made by the Venturelli court holding all Illinois executors to the same standard of care. Assuming arguendo that professional fiduciaries here would be subject to a higher standard of care, our conclusion with respect to the standard of care instruction tendered in the case at bar would not be different. See Estate of Beach (1975), 15 Cal.3d 623, 542 P.2d 994, 125 Cal. Rptr. 570, cert. denied (1978), 434 U.S. 1046, 54 L.Ed.2d 797, 98 S.Ct. 891.
[2] The statute governing trustee conduct in California which was construed in Beach is referred to by that court as the "prudent investor rule." (Estate of Beach (1975), 15 Cal.3d 623, 637 n. 13, 542 P.2d 994, 1002 n. 13, 125 Cal. Rptr. 570, 578 n. 13.) The language in the California statute is very similar to the language of the Illinois statute governing trustee conduct which has been denominated by our legislature as the prudent person rule. (Ill. Rev. Stat. 1983, ch. 17, par. 1675.) Despite this denomination, we refer to the Illinois statute governing trustee conduct as the "prudent investor rule" in this opinion to distinguish it from the common law prudent person rule which governs the conduct of Illinois executors. Christy v. Christy (1907), 225 Ill. 547.